# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>BARRY HOWARD LANDRETH | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>**SA06-0106M** |

Complaint for violations of 18 U.S.C. § 1343.

| NAME OF MAGISTRATE JUDGE<br><br>ROBERT N. BLOCK | UNITED STATES MAGISTRATE JUDGE | LOCATION<br><br>Santa Ana, CA |
|---|---|---|

| DATE OF OFFENSE<br><br>January 1, 2005 to Present | PLACE OF OFFENSE<br><br>ORANGE COUNTY | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

FILED
CLERK, U.S. DISTRICT COURT
MAR 23 2006
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

1. Beginning on or about January 1, 2005 and continuing to the present, within the Central District of California and elsewhere, defendant aided and abetted by others both known and unknown, knowingly devised, participated in, and executed a scheme to defraud victims by means of false and fraudulent pretenses, representations, and promises, and the concealment of material facts, in connection with high yield real estate investments, through the use of interstate wires.

LODGED
CLERK, U.S. DISTRICT COURT
MAR 23 2006
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT |
|---|---|
| | OFFICIAL TITLE<br>BRAD HOWARD-SPECIAL AGENT -- FBI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br><br>March 23, 2006 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.
[Initials GWS: lnz)]          REC: Warrant

ENTERED ON ICMS
MAR 27 2006



## AFFIDAVIT

**I.  INTRODUCTION**

I, Brad Howard, being duly sworn, hereby depose and state the following:

1.  I am a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI") in Santa Ana, California and have been so employed for nine years.  I was trained at the FBI Academy in Quantico, Virginia.  For the last seven years I have primarily worked on investigations of white collar crime, including high yield investment programs, Ponzi Schemes and other mail and wire fraud schemes.  I have attended training on white collar and financial crimes, including money laundering, with the FBI in Quantico and other locations.  Prior to my employment with the FBI, I was an attorney for nine years.  Also, I graduated from college with a business degree with an emphasis in accounting.

**II.  THE PURPOSE OF THE AFFIDAVIT**

2.  This affidavit is made in support of a complaint for an arrest warrant for Barry Howard Landreth ("LANDRETH"), and a search warrant for LANDRETH's residence and business located at 13 Lexington, Coto de Caza, California (the "Subject Premises").

3.  As will be described below, there is probable cause to believe that LANDRETH, doing business from the Subject Premises as Webster Realty Investors, Inc. ("WEBSTER"), has engaged in wire fraud in connection with the offering of high yield, real estate investment programs in violation of 18 U.S.C. Section

1343.

4.  As will be described below, LANDRETH is the founder, President, and Chief Executive Officer of WEBSTER.  LANDRETH operated WEBSTER from the Subject Premises during 2005 and 2006. During that time, LANDRETH offered two investment opportunities: the Discovery Opportunity-Chicago Series ("DO-Chicago") and the Discovery Opportunity-Las Vegas Series ("DO-Las Vegas"). LANDRETH is an adjunct professor in the Masters of Real Estate Development program and the Masters of Business Administration program at the University of Southern California ("USC").

5.  I make this affidavit based on personal knowledge and information that I received from my participation in this investigation.  This affidavit is offered for the sole purpose of establishing probable cause for a complaint to arrest LANDRETH and to execute a search warrant at the Subject Premises, and does not set forth all of the facts of this investigation.

III. **PREMISES TO BE SEARCHED**

6.  The premises to be searched are located at 13 Lexington, Coto de Caza, California, as more fully described in Attachment A, which is incorporated by reference herein.

IV.  **SCHEDULE OF EVIDENCE TO BE SEIZED**

7.  A list of the specific items to be seized from the Subject Premises is attached hereto as Attachment B, which is incorporated herein by reference.  Based on my training and

experience, as detailed above, there is probable cause to believe
that the items listed in Attachment B will be found at the
Subject Premises.

## V.   <u>OVERVIEW OF THE FRAUD</u>

8.   As set forth below, since at least January 2005,
LANDRETH has engaged in a scheme to defraud victims by offering
investments in the DO-Chicago and DO-Las Vegas projects.  The DO-
Chicago project purportedly involved the purchase and development
of land at Michigan and Ohio Avenues in Chicago, or, in the
alternative, the purchase and sale of the land at a profit.
LANDRETH told various victims that he had sold the property to
Cendant Corporation.  The DO-Las Vegas project purportedly
involved LANDRETH's control of an option to purchase 130 acres of
land near McCarran Airport in Las Vegas to either develop or sell
at a profit.  As set forth below, these claims were false.  There
was no sale to Cendant, and LANDRETH held no option to purchase
the land in Las Vegas.  LANDRETH took money from victims with
promises of high rates of return from the projects in time
periods as short as thirty to forty-five days.  No victims were
paid the purported profits from their investments.  With the
exception of a few persistent victims, most victims did not get
back their principal investment.  My review of bank records for
LANDRETH and WEBSTER, set forth below, shows no transfers of
investor money to either of these projects and there are no

3

deposits that can be characterized as income from the purported WEBSTER investments.  Instead of investing money for victims, LANDRETH deposited the money into his personal account and used the money almost exclusively for personal expenses.  In particular, LANDRETH spent close to $500,000 of victims' funds to purchase and maintain show jumping horses.  Based on my review of bank records, I believe the loss to victims in the first ten months of 2005 to be at least $1.5 million.

VI.   **PROBABLE CAUSE**

    A.   **Records from the California Department of Corporations**

9.   In February and March 2006, I received from Sean M. Rooney, Corporations Counsel, Enforcement Division of the California Department of Corporations, packages of materials and information relating to WEBSTER.  The materials include victim complaints, WEBSTER Private Placement Memoranda, correspondence, e-mails and various other information.  My review of the materials revealed the following:

    a.   WEBSTER promotional materials claim that it is a diversified real estate investment and development company with projects nationwide.  The materials state that LANDRETH claimed to have started WEBSTER in 1995.  LANDRETH is identified as the founder, President and Chief Executive Officer of WEBSTER.

    b.   The materials include solicitations for funding the DO-

4

Chicago Series, described as a mixed-use retail/hotel/condominium complex in Chicago.  The wire routing instructions in the materials directed investors to wire money to an account number XXX720 in the name of WEBSTER Realty Investors (the "WEBSTER account"), at the University of Southern California Credit Union ("USC-CU").  The payee was designated as WEBSTER Realty Investors with an address of 13 Lexington, Suite C, Coto de Caza, California 92679 (the Subject Premises).

c.  The materials contain a purported Purchase & Sale Agreement between DO-Chicago Series, LLC (seller) and Cendant Corporation (purchaser).  The Agreement refers to "Land and improvements on the 2.78 acre site located at the confluence of the Ohio and Michigan Avenue [sic] in Chicago, Illinois."  Also, there was a signature page bearing the purported signature of a Cendant official that was apparently part of the agreement.  (As set forth below, the General Counsel for Cendant sent a letter to the Department of Corporations stating that Cendant had no record of any transactions with WEBSTER or Discovery Opportunity.)

d.  Victim complaint forms state that LANDRETH told victims that their investment in the DO-Chicago Series would generate a return of principal and a 190% return within thirty to forty-five days.  The victims' complaints state

that LANDRETH never paid any profit to the victims, and that LANDRETH made false promises, such as the check was in the mail or was being delivered by courier to the victim.  A few victims received back their original principal investment, but only after very difficult discussions, correspondence, and legal threats.

e.  The victims' complaints state that LANDRETH told victims that while the original plan was to develop the Chicago property, he was approached by Cendant Corporation and decided to sell, or flip, the property to Cendant instead of developing it because the return was so good, purportedly a 189% return on investment.  LANDRETH told victims that the Cendant deal closed in July 2005.  LANDRETH asked victims to keep Cendant's name confidential.  After July 2005, LANDRETH came up with a number of excuses for his failure to pay the victims from the sale to Cendant.  LANDRETH blamed the delay on the USC-CU, the law firm of Paul Hastings, an in-house accountant, third party vendors, and an escrow company.

f.  In a letter, dated December 15, 2005, from James E. Buckman, Vice Chairman and General Counsel for Cendant Corporation, Buckman advised the California Department of Corporations that following an inquiry of the applicable business units of the company, they were unable to confirm that Cendant or any of its subsidiaries had purchased any

property from WEBSTER Realty Investors and/or Discovery Opportunity.

g.  I reviewed a WEBSTER Private Placement Memorandum soliciting funding for the DO-Las Vegas Series.  In the Summary of the Offering, the address and telephone number of the Managing Member (LANDRETH) is 13 Lexington Way, Coto de Caza, California 92679 (the Subject Premises), with a telephone number of (949) 713-9826, and a facsimile number of (949) 713-9825.  (On March 22, 2006, I received records from Cox Communications showing that the phone and fax numbers are registered to LANDRETH at the Subject Premises.) The offering states that it is made by DO-Las Vegas, LLC, a Nevada limited liability company.

h.  In an e-mail dated August 11, 2005, to a potential investor named David A., LANDRETH claimed that a property in Las Vegas was being purchased for $1 million an acre. LANDRETH wrote that he expected to sell the Las Vegas property for $5 million an acre to "our buyer on from [sic] our Chicago, Anaheim and Myrtle Beach land deals."  LANDRETH wrote it "works out where it'll be a large dollar return . . . there exists a put option . . . you have the right to exercise your put option to redeem your capital investment plus a flat 12% interest return - somewhat of a safety net to you in case the buyer doesn't perform in the horizon

7

expected." In an e-mail to David A. dated August 10, 2005, Christine Shipp, identified by LANDRETH as in-house counsel for WEBSTER, also stated that the Las Vegas property was being purchased for $1 million an acre and that it "works out where it'll be large dollar return." Shipp wrote that the land was going to be sold to "our buyer on from [sic] our Chicago, Anaheim and Myrtle Beach land deals." Shipp wrote that she spent eighteen years with the SEC before becoming in-house counsel.

i. I reviewed an Offer of Purchase agreement between DO-Las Vegas, LLC, as buyer and Urban Land, Nevada, Inc., as seller, in connection with a 130-acre property located at 121 East Sunset Road in Las Vegas. The agreement was purportedly signed by LANDRETH on January 18, 2004, and by someone for Urban Land, Nevada, Inc., on January 22, 2004. (As set forth below, the owner of the parcel at 121 East Sunset Road in Las Vegas told me he has never heard of LANDRETH or WEBSTER, and has never given an option to purchase the land to anyone.)

j. On December 12, 2005, the California Department of Corporations sent a letter to LANDRETH at the Subject Premises requesting voluntary cooperation from LANDRETH and certain documents to comply with their inquiry. As of the date of this affidavit, LANDRETH has failed to respond to

the inquiry.

**B.   Victim Interviews**

    **1.   Victim Greg S.**

10.   Beginning in October 2005, I spoke with victim Greg S. on several occasions.   In addition, Greg S. provided me with a number of documents concerning his employment and investment with LANDRETH.   From the interviews and my review of the documents I learned the following:

a.   Greg S. was concerned that LANDRETH was making misrepresentations to investors, and selling interests in projects that did not exist.   Greg S. first met LANDRETH during the 2003 school year while attending USC's Masters of Real Estate Development program.   LANDRETH was and is an adjunct professor in the program and was teaching real estate finance at the time Greg S. took the class from him.

b.   In December 2004, LANDRETH approached Greg S. and asked if he would be interested in going to work for him.   In February 2005, Greg S. was hired by LANDRETH and went to work for WEBSTER.   He was hired as a Project Manager.   His direct supervisor was Sam Palmer, an ex-classmate of LANDRETH, but it was clear to Greg S. that LANDRETH was in charge and making all the decisions.   Greg S. worked from his home.

c.   The first project Greg S. worked on was known as the

"Chicago Project." It was supposed to be a $50 million real estate development project in downtown Chicago. Greg S. was supposed to be one of the people locating investors. He estimated that there was approximately $955,000 raised. That amount included $115,000 invested by Greg S. and $10,000 invested by his father in May 2005. LANDRETH had a lot of information printed up and put together which showed financial information, escrow closing statements for the alleged purchase of the property. One of the items that was conspicuously missing was the address of the property. This was never disclosed in any of the documentation. Greg S. recalled that in addition to himself and his father, he brought in two investors in 2005 who invested $150,000 each for a total of $300,000.

d. The second project that Greg S. was aware of was the "Las Vegas Project." This was supposed to be a multi-million dollar development project on raw land in Las Vegas on the "strip" near the Las Vegas airport. On this project, LANDRETH actually had the property address - 121 East Sunset Road in Las Vegas. However, when Greg S. researched the project, he found no evidence that LANDRETH or any of his entities had any interest in the land. Greg S. was aware of $780,000 being raised for that project.

e. Greg S. said that the funds received towards investment

in the above projects were deposited into an account in the name of WEBSTER at the USC Credit Union.

f. During his employment with WEBSTER, from February to November 2005, Greg S. was supposed to receive $100,000 a year. He received his salary through August 2005 at which time the payments stopped. He said that at one point LANDRETH told him that he had health insurance but he has since found out he does not.

g. Greg S. said that from speaking with LANDRETH, he understood that LANDRETH ran WEBSTER from his home (the Subject Premises). On March 20, 2006, Greg S. told me that LANDRETH had leased office space in Los Angeles, but never occupied it. LANDRETH told Greg S. that he never occupied the office space because he wanted to be closer to his corporate jet in Orange County. Greg S. told me he visited the leased office space in Los Angeles and saw that it was vacant. LANDRETH told Greg S. that he worked out of the Subject Premises, and leased out space there, but lived in another house in Coto de Caza. (I have conducted surveillance on the Subject Premises several times in the last few months, the latest being March 20, 2006, and all three vehicles owned by LANDRETH were parked in the driveway. I conducted surveillance at all times of the day and night and usually saw the three cars there. I believe

that LANDRETH does live at the Subject Premises.)

### 2. Victim Arnold C.

11.   In February 2006, I interviewed Arnold C. on two occasions.   In addition, Arnold C. provided me with a number of documents concerning his employment and investment with LANDRETH. From the interviews and my review of the documents I learned the following:

a.   Arnold C. originally met LANDRETH when Arnold C. was a student in LANDRETH's Real Estate Finance Class at USC, where LANDRETH still teaches.

b.   Arnold C. worked for WEBSTER from November 2004 to December 2005.   Arnold C. worked from his home.   He was not fully paid for his work.   Other employees have not been fully paid since September or October 2005.

c.   In 2005, Arnold C. invested $100,000 in the DO-Chicago project.   Several members of Arnold C.'s family also invested in the project.   Despite repeated attempts for a return of their principal investment, including threats of legal action and reporting LANDRETH to law enforcement and the administration at USC, LANDRETH failed to refund money invested by Arnold C. and his family members.

d.   About one or two weeks before Thanksgiving in 2005, Arnold C. attended an Eagles concert at the Staples Center. During the course of conversations with others in the box

12

where they were watching the concert, Arnold C. met Eric R., a lawyer with the law firm Paul Hastings. Arnold C. had heard from LANDRETH that Eric R. was the attorney assisting LANDRETH on his real estate projects. LANDRETH's name came up and Eric R. said he had done some work for LANDRETH in the past. Arnold C. told Eric R. that LANDRETH had said he had met with Eric R. last week. Eric R. told him that was not true, as the last time he spoke with LANDRETH was about six or seven months ago.

e. On the Sunday after Thanksgiving in 2005, Arnold C. and victim Greg S. made a surprise visit to LANDRETH at the Subject Premises. When LANDRETH answered the door, his face turned red, but he quickly regained his composure and started giving Arnold C. and Greg S. the same excuses he gave in the past. For example, LANDRETH told them he was "working night and day" and was trying to get them paid on their investments. Arnold C. told LANDRETH about his recent encounter with Eric R. LANDRETH told Arnold C. that what Eric R. had said was nonsense. LANDRETH claimed that he received e-mails from Eric R. in the last week. LANDRETH also told Arnold C. and Greg S. that they would probably be paid on their investments in the next week. Eventually, LANDRETH finished up the conversation by asking them to come back during "regular business hours."

13

f.   On the Tuesday after Thanksgiving, Arnold C. left a message for Eric R. and then received a voice mail back from Eric R. indicating that there was no current relationship between Eric R. and LANDRETH.

g.   Arnold C.'s father, Stephen C., invested $75,000 in the DO-Chicago project in January 2005.   In addition, Ryan H., an employee of WEBSTER, invested $20,000 in January 2005. Ryan H.'s mother invested $20,000, and his father (victim David D., discussed below) invested a total $90,000, including $70,000 in June 2005.   Victim Grace B. invested $100,000 with WEBSTER in about May 2005.   Victim Simon C. has invested $700,000 in the DO-Las Vegas project.   As far as Arnold C. knows, none of these investors has received any money, either profit or principal money, from LANDRETH.

h.   LANDRETH claimed to have an attorney by the name of Christine Shipp ("Shipp") who worked with him for six or seven years.   Shipp claimed in WEBSTER e-mails that before she joined LANDRETH, she worked for eighteen years with the Securities and Exchange Commission prosecuting "cheats." (As set forth below, there is no record that an attorney named Catherine Shipp ever worked for the SEC.)   Arnold C. said her e-mails were suspicious.   Arnold C. has never met or spoken with her, despite receiving numerous e-mails from Shipp saying that she was coming to California and would

meet with Arnold C.  Arnold C. suspected that she did not exist and LANDRETH was acting as Shipp in the e-mails.  (As set forth above in paragraph 9(h), the August 10, 2005, e-mail purportedly sent by Shipp to a victim contained identical language, including a grammatical error, as the August 11 e-mail sent by LANDRETH.)  The only WEBSTER employee that said he actually spoke with Shipp, was Sam Palmer, who was very close to LANDRETH.

i.  Arnold C. provided me a copy of undated promotional material for WEBSTER Realty Investors which states that WEBSTER Realty Investors had a total equity capitalization of $740 million.  The materials include a biography of LANDRETH which states that he is an adjunct professor in the Masters of Real Estate Development program and the Masters of Business Administration program at USC.

**3. Victim David D.**

12.  In February and March 2006, I spoke with victim David D. on several occasions.  In addition, David D. provided me with a number of documents concerning his dealings with LANDRETH. From the interviews and my review of the documents, I learned the following:

a.  David D. met LANDRETH through David D.'s stepson, Ryan H., who was an employee of WEBSTER.  David D. said Ryan H. did not really work for LANDRETH anymore and had not been

15

paid for some time.  Ryan H. had also invested in WEBSTER.

b.  David D. said that in early 2005 he invested $20,000 in
a real estate project LANDRETH claimed to have in Myrtle
Beach, South Carolina.  In approximately June 2005, LANDRETH
told him that the $20,000 from the Myrtle Beach project had
been rolled over to the DO-Las Vegas project.  David D.
invested another $70,000 in the DO-Las Vegas project in June
2005.  Of the $70,000, $10,000 was paid by check.  The
remaining $60,000 was wired from David D.'s investment
retirement account in New York to the WEBSTER account at
USC-CU.

c.  LANDRETH told David D. that the DO-Las Vegas project
would be a business complex and time shares.  LANDRETH said
he was using investors' money to buy the property and would
sell the property at a profit, or develop the property and
then sell it for a profit.

d.  LANDRETH told David D. that he would receive 10%
interest accumulating annually and a percentage of the
profit when the deal was completed.  LANDRETH said David D.
would regularly get a financial statement showing his
account balance.

e.  David D. invested a total of approximately $90,000 with
WEBSTER.  Financial statements provided by LANDRETH showed
that as of approximately September 2005, the investment had

16

a value of approximately $129,000. When I first interviewed David D. in early February 2006, he had not received a financial statement from LANDRETH since September 2005. David D. never received any money back from LANDRETH.

**C.  Tape Recording of LANDRETH**

13.  At my request, on February 21, 2006, David D. recorded an in-person lunch meeting with LANDRETH at the El Torito restaurant in Irvine, California. I have listened to the recording and heard the following statements made by LANDRETH:

a.  LANDRETH told David D. that WEBSTER was just about done with the DO-Las Vegas project. He told David D. that WEBSTER controlled the option to buy the land at $130 million. LANDRETH claimed that WEBSTER received five unsolicited offers to buy the project, and had sold the option for $650 million. He said the total pool of money was $520 million, which was in an escrow account where the investor reconciliation was occurring.

b.  LANDRETH told David D. that his initial investment now had a value of $667,000 and the money would be disbursed to David D. soon. LANDRETH provided David D. with a spreadsheet showing his investment.

c.  LANDRETH told David D. that all of the $60,000 that David D. wired to WEBSTER's bank account at the USC-CU (referenced in paragraph 12(b), above) was transferred,

along with all of the other investor's money, to an escrow
account at Chicago Title.

d.   LANDRETH said that WEBSTER was now worth $3 billion.  He
said that WEBSTER had a portfolio overseas and did a lot of
currency trading.

**D. Interview of Kevin Chiarello of Chicago Title**

14.   On March 17, I interviewed Kevin Chiarello
("Chiarello"), Chief Compliance Officer for Chicago Title.  He
said that in response to my inquiry on March, 3, 2006, he
initiated a check with Chicago Title to determine if it is, or
has been, involved in an escrow with WEBSTER Realty Investors or
LANDRETH.  Chiarello said that a search of Chicago Title's
databases showed no evidence of any relationship between Chicago
Title and WEBSTER or LANDRETH.  Specifically, he told me that the
databases for California and Illinois were checked with negative
results.

**E.   Interview of Theodore Lee, Owner of the Las Vegas
     Property**

15.   On March 14, 2006, I interviewed Theodore B. Lee
("Lee"), the President and owner of Urban Land Company.  Lee told
me he has owned a 130-acre property located at 121 East Sunset
Road in Las Vegas for thirty to forty years.  He has not sold the
property, or provided anyone with an option to buy the property.
Lee was recently served with papers in a lawsuit wherein it was

alleged that WEBSTER and LANDRETH recently sold Lee's property.
Before receiving the lawsuit, Lee had never heard of WEBSTER or
LANDRETH.  Lee never met or spoke with LANDRETH, and never gave
LANDRETH an option to buy his property.

### F. Interview of Jeff Risinger of the SEC

16.   On February 2, 2006, I interviewed Jeff Risinger
("Risinger"), Director of Human Resources for the Securities and
Exchange Commission.  Risinger told me that he checked SEC
records to determine if an attorney by the name of Christine
Shipp ever worked for the SEC.  Risinger advised that he could
not locate any records to show that Christine Shipp ever worked
for the SEC.  Risinger checked payroll records from year 2000 to
the present, a personnel database from 1970 to 1999, as well as
files on microfiche dating back before 1970.  He was not able to
locate Christine Shipp.

### G.  Bank Activity

17.   In the course of my investigation, I determined that
LANDRETH used two accounts at USC-CU.  I determined the existence
of these accounts from information provided to me by WEBSTER
employees and victims.  I have reviewed bank records from USC-CU
for the WEBSTER account, identified above, and LANDRETH's
personal Trojan Checking account, number XXX760 (the "Trojan
account"), for the time period of January 1, 2005, to October 31,
2005.  The records show that LANDRETH did not invest the money he

19

received from victims as he had promised.

18.   For example, with respect to the WEBSTER account, the records reflect that approximately $1,473,000 from investors was deposited, but there is no evidence that any of the money was invested in any type of land or development project.   Instead, I saw that LANDRETH transferred about $718,000 to the Trojan account, wired about $22,000 to Merrill Lynch accounts in his name and his wife's name, and withdrew about $12,000 in cash. Most of the remaining money in the account was used to pay employee salaries and other possible business expenses of WEBSTER, and, in a few instances, to return principal investment money to victims.

19.   With regard to the Trojan Account, in addition to the approximately $718,000 transferred in from the WEBSTER account, approximately $225,000 from investors was directly deposited into this account.   The Trojan account also contained deposits from LANDRETH's employment at USC and his wife's employment, for a combined total of approximately $45,000 in legitimate income.   As with the WEBSTER account, there were no withdrawals from the Trojan account that pertain to any type of land or development project.   Withdrawals from this account were for expenses that appear to be personal in nature, including approximately $47,000 in cash, $52,000 to the Merrill Lynch accounts for LANDRETH and his wife, $73,000 to purchase a new 2005 Cadillac Escalade, and

$486,000 for the investment in, or purchase of, show jumping horses, as well as the costs of keeping the horses.

20.   I traced Victim David D.'s $60,000 that was wired to the WEBSTER account in June 2005, referenced in paragraph 12(b), above.   Before the wire reached the account, the balance was $222.78.   Following the wire the balance was $60,222.78.   It was not immediately transferred to an escrow account as LANDRETH claimed in the February 21, 2006, tape-recorded meeting referenced in paragraph 13, above.   The next transaction of more than $100 in the WEBSTER account following the David D. wire was a transfer of $25,000 to the Trojan account, followed by a transfer of $7,500 to a Merrill Lynch account, and then another transfer of $25,000 to the Trojan account.

21.   Bank records show that on March 10, 2005, the Trojan account received a wire of $79,000 from First Horizon Equity Lending in Memphis, Tennessee, on behalf of victim Nicola M.   The beneficiary was listed as Barry LANDRETH/WEBSTER Realty.

22.   From my review of the bank records, LANDRETH did not send any money that he received from victims to any type of land or real estate projects.

23.   I reviewed the records from LANDRETH's Merrill Lynch accounts and found that the money sent to these accounts was used for a variety of mainly personal, and arguably some business, expenses such as airline tickets, rental cars, horse-associated

expenses, clothing, gas, groceries, restaurants, hotels, tires, and ATM cash withdrawals.  No money was sent from the Merrill Lynch accounts to any type of real estate project.

24.  Based on my review of the deposits from victims and funds returned to some of the victims, I believe the amount of loss in this case from the DO-Chicago and DO-Las Vegas schemes in the first ten months of 2005 is at least $1.5 million.

**H.  EDD Records**

25.  In November 2005, I requested from the Employment Development Department ("EDD") of the State of California all income information for LANDRETH and WEBSTER for the year 2005.  I understand EDD to be a state agency that has a database containing quarterly wage and withholding reports for employers in California.  In December 2005, I was advised by the EDD that wage information was only available through the third quarter of 2005.  The wage record display for LANDRETH showed earnings from USC for the first quarter of $5,275.74, the second quarter of $5,358.16, and the third quarter of $5,193.30.  There was no record of any earnings from WEBSTER.  Based on my experience investigating fraud cases, I would expect that if WEBSTER were a legitimate business, there would be records at EDD demonstrating LANDRETH's, or other employees', wage information from WEBSTER during this time period.

////

**I.  Use of Subject Premises to Conduct Business**

26.  There is probable cause to believe that LANDRETH uses the Subject Premises to conduct business.  As set forth above in paragraph 9(b), solicitation materials for WEBSTER that I obtained from the Department of Corporations listed WEBSTER's address as that of Subject Premises, with the addition of "Suite C" to the address.  Similarly, a private placement memorandum for the DO-Las Vegas project lists the Subject Premises as the address of the managing partner, as set forth in paragraph 9(g). The phone and fax lines for the managing partner are registered to LANDRETH at the Subject Premises.  Victims Greg S. and Arnold C. worked from their homes while employed by LANDRETH, as set forth in paragraphs 10(b) and 11(b).  LANDRETH told victim Greg S. that he conducted business from his home, as set forth in paragraph 10(g).  In addition, when Greg S. and Arnold C. went to the Subject Premises to confront LANDRETH about returning their money, LANDRETH told them to come back during regular business hours, as set forth in paragraph 11(e).

27.  I found no evidence that LANDRETH conducts business from an office.  As set forth in paragraph 10(g), victim Greg S. told me that LANDRETH had leased office space in Los Angeles but never occupied it.  In the course of my investigation, including my surveillance and analysis of bank records, I have found no evidence that LANDRETH leased or occupied any office space.  The

23

only recurring expense I found that pertained to a rent payment was a monthly payment of $2,800 to the owner of the Subject Premises, which I understand to be the monthly rental payments.

**J.   Permeated by Fraud**

28.   There is probable cause to believe that LANDRETH's real estate investment business is permeated by fraud, based upon several facts and reasonable inferences to be drawn from those facts, including the following:

a.   Throughout 2005, LANDRETH solicited investments in two projects: the DO-Chicago and DO-Las Vegas projects.  As set forth above in paragraph 15, the owner of the property in Las Vegas that LANDRETH claims to have held an option to purchase, and subsequently sold, still owns the property, had never heard of LANDRETH prior to receiving papers in a lawsuit, and never gave anyone an option to purchase the property.  As set forth in paragraph 12(f) above, the General Counsel for Cendant Corporation stated that he could find no record of Cendant having done any business with WEBSTER, despite LANDRETH's claim that he had sold a property in Chicago to Cendant in July 2005.  Similarly, Chicago Title has no record of an escrow account with WEBSTER or LANDRETH.

b.   As set forth in paragraphs 18 and 19 above, my review of bank records for WEBSTER and LANDRETH shows that in 2005 he

used funds received from victims for his personal expenses, including nearly $500,000 for jumping horses.  My review did not show one instance of money being used to buy or develop property.

c.  As set forth in paragraph 15, LANDRETH claimed in the tape-recorded meeting with victim Greg S. that WEBSTER was worth $3 billion.  As set forth in paragraph 11(i), promotional material for WEBSTER claimed it has equity capitalization of $740 million.  My review of bank records shows neither LANDRETH nor WEBSTER had any significant assets other than income from victims.  As noted in paragraph 12(b) above, prior to receiving $60,000 from victim David D. in June 2005, there was little more than $200 in the WEBSTER account.

29.  Accordingly, there is probable cause to believe that (a) LANDRETH and WEBSTER are engaged in criminal activity, described herein, (b) that all of the business records for LANDRETH and WEBSTER pertaining to real estate investments from January 1, 2005 to the present are likely to evidence the criminal activity, and (c) the evidence of the criminal activity is inseparable from other documents pertaining to real estate investment for the relevant time period that may be located at the Subject Premises.

////

## VII.  PROCEDURES FOR HANDLING COMPUTERS

30.   Based on copies of e-mails to and from LANDRETH that have been provided to me by victims and the California Department of Corporations, noted above, there is probable cause to believe that LANDRETH uses a computer in furtherance of the scheme, and that evidence pertaining to the scheme will be found on any computers he uses.

31.   Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.   I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.   Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.   In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of

26

computer, software application or operating system that is being searched.

b.   Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.   The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found

during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

d.   Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

VIII.    **PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED ATTORNEY-CLIENT COMMUNICATIONS**

32.   The procedures set forth in Attachment C will be

followed at the time of the search in order to avoid unnecessary disclosures of any potentially privileged attorney-client communications which may be found at the Subject Premises. I believe that LANDRETH and WEBSTER are currently represented by legal counsel in connection with a civil action filed by a victim who invested funds with LANDRETH and WEBSTER.

## IX.  CONCLUSION

33.  Based upon the above-stated facts, there is probable cause to support a complaint and arrest warrant for defendant for violations of 18 U.S.C. § 1343, and to believe that the Subject Premises contain evidence of violations of 18 U.S.C. § 1343.

_____
Brad Howard
Special Agent, FBI

Subscribed and sworn to
before me this 23d day
of March, 2006.

_____
HON. ROBERT N. BLOCK
UNITED STATES MAGISTRATE JUDGE