1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HON. CORMAC J. CARNEY, JUDGE PRESIDING

**ORIGINAL**

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
      vs.                      )   NO. SACR 06-00055-CJC
                               )
BARRY HOWARD LANDRETH,         )
              Defendant.       )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

MONDAY, JULY 10, 2007

SENTENCE

Maria Beesley-Dellaneve, CSR 9132
Official Reporter
Ronald Reagan Federal Building
411 W. 4th Street, Room 1-053
Santa Ana, CA  92701
(714) 564-9259



FILED
SEP 1 4 2007
SD/IL  9:00
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION OF SANTA ANA
BY _____ DEPUTY

DOCKETED ON CM
SEP 1 4 2007
BY                040

1    APPEARANCES:

2    FOR THE PLAINTIFF:    GEORGE CARDONA
                           UNITED STATES ATTORNEY
3                          BY:  GREG STAPLES
                           ASSISTANT UNITED STATES ATTORNEY
4                          411 W. 4TH STREET, 8TH FLOOR
                           SANTA ANA, CALIFORNIA 92701

5

6

7    FOR THE DEFENDANT:    DEAN R. GITS
                           FEDERAL PUBLIC DEFENDER
8                          By:  CHASE SCOLNICK, DFPD
                           411 W. 4th Street, 7th Floor
9                          Santa Ana, California 92701

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          SANTA ANA, CALIFORNIA; MONDAY, JULY 10, 2007

2                          9:00

3                          -oOo-

4          THE CLERK:  Item one, SACR 06-00055-CJC.  USA versus

5    Barry Howard Landreth.

6          Counsel, please state your appearances for the record.

7          MR. STAPLES:  Good morning, Your Honor.  Greg Staples

8    for the United States.  With me at counsel table is FBI special

9    agent Brad Howard.

10         THE COURT:  Good morning, gentlemen.

11         MR. SCOLNICK:  Good morning, Your Honor.  Chase Scolnick

12   on behalf of Mr. Landreth, who is present.

13         THE COURT:  Hello, Mr. Scolnick; hello, Mr. Landreth.

14         We're here for the sentencing of Mr. Landreth.  I should

15   say on the record I have received the presentence investigation

16   report as well as the addendum to that presentence report.  I have

17   received the government's position papers.

18         And I have also received, Mr. Scolnick, your position

19   papers as well as all the exhibits that you attached.

20         Let me tell you what my tentative determination is on

21   the advisory guideline range, then I'll try to identify what I

22   understand the parties' respective positions.  Then as I

23   understand it, we have several victims who would like to make

24   statements.  I'll hear from them.  And then I'd like to hear from

25   the lawyers, and obviously I'd like to hear from Mr. Landreth.

4

1       On the advisory guideline range, I calculate an offense

2  level of 22.  The base offense is plus seven, the amount of loss

3  is over a million dollars, plus 16.  I do find an abuse of trust

4  of plus two and then minus three, acceptance of responsibility.  I

5  understand in the presentence investigation report they indicated

6  that the enhancement for more than 10 victims should apply, but

7  that is contested, and I know in the parties' plea agreement they

8  didn't agree to that enhancement.  So I don't feel I have

9  sufficient evidence before me, and certainly Mr. Landreth never

10  pled guilty to that enhancement.  So I don't see how I have enough

11  evidence before me to apply it.

12       The criminal history category is obviously category one

13  because Mr. Landreth does not have a prior criminal history.  So

14  that gets to a sentencing range of 41 to 51 months under the

15  advisory guideline range.  Probation's position is a sentence of

16  41 months is appropriate.  Again, they did not apply the abuse of

17  trust enhancement, but they did apply a 10-victim enhancement;

18  more than 10 victims.

19       The government's position is 41 months as well.  The end

20  result is the same, as understand it, Mr. Staples, but you do

21  apply the abuse of trust enhancement, but you do not apply,

22  consistent with the plea agreement with Mr. Landreth, the victim

23  enhancement.

24       MR. STAPLES:  That's correct, Your Honor.

25       THE COURT:  Then as I understand it, Mr. Scolnick, your

5

1    position that you are arguing on behalf of Mr. Landreth is a 24-

2    month sentence which you believe a split sentence would be

3    appropriate.  You cite to several 3553 factors that Mr. Landreth

4    has suffered a lot already; that he has a medical condition, and

5    you want to put him in a position sooner, rather than later, to

6    start paying back the restitution.

7            MR. SCOLNICK:  That's correct, Your Honor.

8            THE COURT:  So that's, as I understand, the parties'

9    positions.  I want to hear from the victims, obviously.  I want to

10   hear from the government; I want to hear from Mr. Scolnick; and,

11   of course, if Mr. Landreth has anything to say, I'd like to hear

12   from him or anybody else that, Mr. Scolnick, you would want to

13   present.

14           One thing I am going to want to have a better

15   understanding, Mr. Staples, is your recommendation on a low-end

16   sentence given the nature of the offense, given the great mental

17   suffering that has caused to many people as well as the proceeds

18   that were used from the crime to fund what I perceive to be an

19   extravagant lifestyle, why a low-end sentence is the appropriate

20   one.  Maybe it's because of the reasons Mr. Scolnick has

21   articulated about the physical condition of Mr. Landreth as well

22   as the suffering he has incurred, potential loss of his wife,

23   etcetera, but I'd just like to understand your recommendation a

24   little bit better.

25           MR. STAPLES:  I can do it quite briefly, Your Honor.

1    It's as simple as how soon can he start paying people back.  This

2    Court is aware of -- any Court -- the volume of fraud cases we see

3    in this district.  Quite often it's the case that you either have

4    such an enormous amount of loss that it's not reasonable to expect

5    a defendant to be able to pay it back in full or nearly in full in

6    his lifetime.  Or I know I have handled several cases where the

7    defendant himself or herself is of such an age it's just not

8    practical, even if the loss is not that great, that she could pay

9    it back.

10            In this case, I basically exercised what I thought my

11   judgment was in terms of what is a good balance between a sentence

12   that is severe enough to punish the conduct here, but at the same

13   time serve what, in my mind is at least as equally an important

14   goal of paying these people back.  Unlike a lot of cases that I

15   have dealt with anyway, this is a defendant who is fairly young,

16   who is obviously well educated, somewhat of an entrepreneur.  He

17   was able to get a teaching post at a very prestigious university.

18   I believe that he will be able to get out and, in his lifetime,

19   even sooner that, be able to make the restitution.  1.5 million is

20   not an impossible goal for a man of this ability.

21            So I think, as I have said to this Court before,

22   figuring a sentence -- and again, you know better than I -- is an

23   art, not a science.  So in balancing the factors, on the one hand

24   you have sort of the hand of punishment and it should be severe.

25   On the other hand, I think that the interest of the victims is

1    both seeing him punished but make them whole.  I mean, that's

2    really the best possible outcome in this case, is get them their

3    money back.  That's been the source of their suffering and their

4    loss and their ongoing financial hardship.

5           So in my view, 41 months, the low-end recommendation,

6    was my best approximation of how to accomplish both those goals.

7    Would it make a difference if he were to spend another year or two

8    in jail?  Arguably not.  But again, I think he needs to serve a

9    severe sentence, but the government wants to see him go to work

10   and have liens put on his account.  We have a very effective

11   financial litigation unit as far as collecting judgments and

12   restitution.

13          I want to see the victims get paid back.  There is not

14   hundreds of victims here.  I believe there is nine, 10 or 11.  And

15   it's a finite amount of $1.5 million.  Even working at a middle

16   income job with garnishment and so forth, I mean, he could

17   realistically, I believe, pay the sum back and pay it back in

18   full.

19          THE COURT:  Do you have any sense of where the

20   forfeiture action is going?  I know I signed a judgment yesterday

21   where the horses -- I believe there was a Cadillac, SUV, I didn't

22   see anything about a house.  I remember there was a house in Coto

23   de Caza rented.

24          MR. STAPLES:  I believe that was rented.

25          THE COURT:  Do you have any sense, Mr. Staples, on how

1    much money has been obtained through the seizure of those assets

2    or how much will be obtained to be able to pay the victims?

3             MR. STAPLES:  It's a ballpark figure at this point given

4    the horses have to be sold, but my understanding is it's

5    approximately $100,000.

6             THE COURT:  That's not much.  I'm not going to fight

7    you.  In fact, I wholeheartedly agree with you that paying the

8    victims, if it's a possibility, is something I definitely want to

9    consider and will consider.  It's just -- hopefully it doesn't

10   sound too cynical, but $1.4 million, giving the 100,000 credit,

11   that's a lot of money.  That's a lot of money, especially with

12   someone who is going to have a conviction on his record.

13            MR. STAPLES:  I may be overly optimistic.  There are, as

14   we see in the papers, convicted felons who go on and do quite

15   well.  People like Michael Milken.  I mean it is possible.  Again,

16   it's --

17            THE COURT:  Mr. Milken had millions and millions of

18   dollars still set away that were not seized.

19            MR. STAPLES:  All you can really do at some point is

20   make an educated guess.  Again, I think 41 months is a significant

21   sentence for a first-time offender.  Again, balanced against what

22   is my hope, that meaningful restitution can be made to these

23   victims.  And I would not -- I couldn't argue with the Court if

24   the Court were to say, I do not believe this is not a sufficiently

25   long sentence, it should be longer.  I really can't debate that.

1    It's not a finite science.  You have to go with your gut at some

2    point.

3              THE COURT:  And you know me well enough, I have never

4    had a problem with your recommendations on sentencing.  And I

5    respect the agreement that you reached with Mr. Scolnick and Mr.

6    Landreth, and I think that needs to be given significant weight.

7    I don't sense you are taking my questions the wrong way, it's just

8    all I have in the plea agreement is a recommendation, low end, and

9    I just wanted to flush that out from you.

10             MR. STAPLES:  And I appreciate that.  Like I say, my --

11   I have explained what my motivation was anyway.  I believe that

12   rather than have me stand here and talk for the victims, you will

13   hear from them themselves as to what they believe an appropriate

14   punishment would be.  Again, my main motivation was to try and see

15   them made whole.

16             THE COURT:  I understand that.  Okay.  Well, this

17   probably would be then the most appropriate time if I started

18   hearing from the victims.  You want to --

19             MR. STAPLES:  I'd ask them to state their name for the

20   record.

21             MR. DAILY:  Your Honor, my name is Justin Daily.  I

22   represent victim Simon Chu.  I have represented him in a civil

23   matter against Mr. Landreth.  My client was defrauded out of a

24   total of $650,000.  I thought it important to let you know that in

25   the civil matter we sought to have a receiver set up to take

1    control of some of the money that Mr. Landreth had stolen from my

2    client.

3          Mr. Landreth convinced the judge in that case, Judge

4    Wilkinson, that he would enter a settlement agreement and he would

5    fund the settlement agreement with sufficient amount of money to

6    pay off my client.  That never happened.  Eventually he was

7    arrested and that's where we are now.  But as far as --

8          THE COURT:  That's a lot of money, $650,000.  Tell me,

9    Mr. Chu, was he one of the employees of the company?  Former

10   student?

11         MR. DAILY:  He is a former student.  He is an architect

12   and a developer, but he was not an employee.

13         THE COURT:  How did he -- I'm not trying to needlessly

14   pry into his privacy and financial affairs.  That's a lot of

15   money.  I don't have $650,000 now or even in a former life to

16   invest.  Did he borrow from other relatives to get that money?

17         MR. DAILY:  No, Your Honor.  It's my understanding it is

18   his money.  He has done well for himself.  As a graduate of USC

19   and a positive member of the community, he has done well for

20   himself.

21         THE COURT:  Okay.  And did he -- I know it's a bit of a

22   hearsay, but tell me, I did receive a letter.  Was he one of the

23   signatores to that letter?

24         MR. DAILY:  No he is not, Your Honor.

25         THE COURT:  Who motivated him to invest the $650,000, if

1   you know?

2        MR. DAILY:  Well, my understanding, Your Honor, is that

3   through his education at University of Southern California, he was

4   in the master of real estate development program.  Mr. Landreth,

5   Professor Landreth routinely spoke of particular projects that he

6   had during class, and then would, after class, sometimes solicit

7   his students' participation in these projects.

8        And my understanding is that due to the relation -- the

9   relationship that Mr. Landreth was able to cultivate, the trust

10  that he was able to get with his students, he was able to convince

11  my client to invest such a large amount of money.  And it is a

12  large amount of money for him as well.  It put him at great

13  financial hardship.

14       THE COURT:  Okay.

15       MR. DAILY:  My point, Your Honor, is that as far as the

16  goal of getting the victims paid back, I don't think many of the

17  victims -- I certainly don't -- agree that Mr. Landreth is going

18  to be a positive member of society or that he is going to go to

19  any great effort to pay back the victims.  I think he is a clever

20  charlatan, and that's as far as it will go.  He won't -- in my

21  opinion, I see very little chance he is going to have any positive

22  contribution to the victims.

23       I think if you ask any of these victims, they would

24  rather see him spend more time in jail.

25       THE COURT:  Well, I certainly will be asking that.  I

12

1    greatly appreciate your comments.  I am not trying to withdraw my

2    agreement with Mr. Staples that if I can get money back to them, I

3    definitely want to do it.  I'm actually comforted to hear your

4    statement, though, that at least with respect to your client, he

5    is not expecting to get his $650,000 back, because I don't want

6    any false hope, is where I'm coming from.

7            MR. DAILY:  He would certainly like it, but I think he

8    has been through so much so far that he is skeptical, to say the

9    least, that it will ever happen.  Thank you, Your Honor.

10           THE COURT:  Thank you, sir.

11           VICTIM ROSENBERG:  Good morning, Your Honor.

12           THE COURT:  Good morning, sir.

13           VICTIM ROSENBERG:  Good morning both sides.  My name is

14   Steven Mark Rosenberg.  I hold an MRED degree from USC and I also,

15   by way of credibility, brought my USC master of safety degree that

16   I earned in 1989.  I'll make some reference to that in a little

17   bit.

18           I had Mr. Landreth's class in January of 2005, FBE 2005.

19   I would like to share a few anecdotal instances that really relate

20   to some of the follow-through discussion that we just heard.  I do

21   want to go on record, the current penalty is not enough and I want

22   to emphasize that enough.

23           The first several weeks of the course that I had with

24   Mr. Landreth he would discuss a project in Myrtle Beach.  Now, I

25   have reviewed the FBI file, and maybe there is a little disconnect

13

1    or whatever, but I did not ever see any mention of some of the

2    ongoing things that happened in Myrtle Beach as it related to Mr.

3    Landreth.  So I have taken the liberty to cull some of those

4    articles.  And in the interest of time, I won't belabor a lot, but

5    I'm going to be very succinct on some of these things.

6          Bear with me here.  So this is dated January 27.  It's

7    from the Myrtle Beach Sun News, and I'm reading verbatim for the

8    record.  "More discrepancies into the references of former Myrtle

9    Beach Pavilion Amusement Park master developer Barry Landreth have

10   surfaced, including a statement from Goldman Saks saying the

11   investment firm has never done business with him.  On Tuesday,

12   Goldman Saks issued a statement to the Sun News saying the

13   involvement firm has never done business with Landreth.

14         The e-mail reference dated February 2004 did not come

15   from the firm.  In the original e-mail written from a generic

16   Yahoo account which local officials said carried a lot of weight

17   because of the firm's reputation, the individual said, 'we have

18   had equity commitments with Webster Realty for three years.'  That

19   was not true.  According to our records, Goldman Saks did not have

20   any business relationship with Mr. Landreth or his company, said

21   Andrea Rafael, a Goldman Saks spokesman."

22         MR. SCOLNICK:  Your Honor, at this point I have to

23   object.  I realize that the victims do have a right to address the

24   Court and --

25         THE COURT:  Statutory right.

1        MR. SCOLNICK:  A statutory right; however, this is not

2  really what's intended, in my opinion, by a victim impact

3  statement.  The victim here is reading into the record instances

4  and facts which he has no personal knowledge.

5        THE COURT:  Mr. Rosenberg, let him state his objection.

6        MR. SCOLNICK:  It's one thing, Your Honor, if this

7  victim would like to say what his experience was with Mr.

8  Landreth, and I invite the victim to do so; however, if the victim

9  is merely reading a newspaper article into the record, that's

10 quite another story.  And if that's going to be the case, we

11 contest many of these facts.  They're beyond the record, they're

12 beyond what is before this Court and beyond the scope.  And to

13 that, I would object, Your Honor.

14       THE COURT:  I understand your objection.  I'm going to

15 let Mr. Rosenberg speak a little bit and then let's see what he

16 has to say.  He did represent to me that he would try to be

17 distinct.

18       And I would like to focus you, Mr. Rosenberg, because I

19 want to understand what Mr. Landreth did to you specifically.

20       VICTIM ROSENBERG:  Okay.  I have three other articles

21 about Myrtle Beach and bounced checks in the amount of a million

22 and a half dollars.  I will not read that.  I will read a personal

23 e-mail that I wrote to a friend of mine the day after Barry's

24 arrest.

25       Can I read an e-mail that related to my class

1    experience?

2          "Paul, in regards to your voice mail of last night,

3    indeed, this is a black eye for the school.  I actually had Barry

4    Landreth as a teacher for FBE 570 last year."  My e-mail is dated

5    March 26 2000.

6          "Do a Google on his name and you'll see some interesting

7    stuff on the Myrtle Beach deal.  He would spend the first half

8    hour in class explaining this was all bogus and that it was just a

9    personal grudge that the mayor of the town had against him and

10   that he was going to sue and prevail, and that he had Paul

11   Hodgins, the top law firm on his side to do this."

12         I can understand how these victims really got hoodwinked

13   as they were in their class.  I have been around the block at USC

14   I have legitimately collaborated with professors on a project in

15   1989 with Bell Labs on a handbook for them.  You'll see Peter

16   Hancock PhD, University of Southern California, project

17   consultant, consultant.  My name Steven Rosenberg, University of

18   Southern California, as his graduate student in a bone fide

19   relationship.

20         What Mr. Landreth did is totally egregious.  Why he

21   needs longer punishment is because I was around when there was

22   Keating and the RTC, and there was a big ethics problem in the

23   1990s.  We're now in an environment of the Enron environment.

24   This is a larger ethical issue to display.

25         Do you know when he was arrested?  It was during Easter

1    and one of my classmates came back.  He was in India of all

2    places.  And he had said he had read about the account of the

3    arrest in an Indian English paper under the news of a category

4    called News of the Bizarre.  This is worldwide focus at this

5    point.  Your ruling today literally is going to send a message to

6    everybody.  I would think I can develop a $25,0000, 3-D Las Vegas

7    promotional film for property that didn't exist, which he showed

8    in his class, and I can get $40,000 a year.  And if I only have to

9    do three years in federal prison, my God -- I have higher ethics

10   than that.  And I would hope in your ruling today you present

11   higher ethics as it's manifested in your sentence.

12            THE COURT:  Sir, did you invest in any of the projects?

13            VICTIM ROSENBERG:  Let me tell you what I invested.  Mr.

14   Landreth is very shrewd in his methodology, as was put forth in

15   the three students' letters.  At the beginning of each semester he

16   would say, please provide a resume and what you hope to get out of

17   the class.  At that point in time, I replied I was working at the

18   Port of L.A.  And I'm paraphrasing my e-mail, which I do have.  I

19   said, "I hope to learn from your real-world experiences."

20            How naive was I.  "And maybe even leave the port earlier

21   than I anticipated."  And I was so bedazzled personally by stories

22   of Escalades that were bought by Alicia Keyes at Grammy night.  By

23   private tables at Morton's Dinner House.  These are all in my

24   class notes, by the way.  If you want to subpoena them, feel free.

25            It had such an impact on me.  I personally resigned from

1    my Port of Los Angeles position that was paying me $85,000 a year.

2    For the last two years, because of age factor, I go on interviews

3    now, and I can't tell you how many times they will tell me, we

4    can't pay you the salary you were making.  How old are you?  I

5    know these are illegal questions.  He has impacted me not by

6    monetary contribution, but by severe hardship economically by

7    presenting that you can really do this on its own.

8              It's not true.  Well, it's true, but I was hoodwinked.

9    And I would say my monetary loss on this is at least $200,000 for

10   the last two years that I have gone struggling.  Everything that

11   was written by the three students, I can actually provide various

12   little anecdotal deals.  This man is very shrewd for his final

13   business project.

14             All right, everybody, you are going to get a nice

15   reward, whoever comes up with the best real-world project

16   scattered throughout the United States.  It has to be at

17   $5 million or plus.  You are going to present it to me at the end

18   of the semester.  Best project gets a dinner at Morton's.

19             Second place, what was it, Mr. Landreth?  McCormick and

20   Schmick's, and third place was Fat Burger, right?

21             Well, because I had been around the block I am used to

22   sometimes exploitation of professors or graduate students.  I had

23   one class where the professor was a consultant for NASA and he was

24   designing the interior design of the space shuttle.  What was the

25   final project for the class?  Designing a final project for the

18

1    space shuttle.  This, by far, is more egregious of taking

2    students' ideas for his next Ponzi scheme.  He is dangerous.

3    That's all I have to say.  Thank you.

4              THE COURT:  Thank you, sir.

5              VICTIM HAMMOND:  Good morning, Your Honor.  My name is

6    Ryan Hammond.  I was an employee for Mr. Landreth for roughly

7    three years.  Just a couple points I want to make that might not

8    have been made aware earlier.

9              One of the strange things about everything that is going

10   on with this case is Mr. Landreth's false perception of reality or

11   lack to understand really what's right and what's wrong; lack of

12   understanding what is moral, what is ethical.  The man did create

13   two fictitious employees:  An administrative assistant on the East

14   Coast and an attorney who used to work for the S.E.C.  That would

15   be Jim Cogner and Christine Ship.  These fictitious characters

16   existed for years.

17             I don't believe he is sound of mind to really contribute

18   anything to society.  I don't think that long-lasting he ever will

19   be.  I just don't think he is healthy.  I don't know about his

20   physical ailments but certainly mentally I do not think he is

21   healthy.

22             You had touched on a sentencing modifier based on 10-

23   plus victims.  I just want to say that beyond the individuals who

24   invested directly with him there are friends, family members, my

25   sister-in-law, my brother-in-law, their infant child at the time

1   when they were trying to start a family.  They were assured that

2   this was a sound investment.  So the list of victims really goes

3   down and through extended families.  It's not just the people who

4   wrote the checks.

5           To touch on a couple other notes and other -- a few more

6   points.  The list of falsified documents was ridiculous in all the

7   investments and all the opportunities.  Everything from certified

8   documents to Mr. Landreth having his employees sign W-4s to become

9   salaried employees.  Those W-4's were probably thrown in the

10  trash.  No deductions were made for payroll taxes.  No deductions

11  were made for unemployment insurance.  So when the plug was

12  pulled, everything fell through.

13          I looked up the tax ID of his many organizations.  There

14  is no record of any unemployment tax being paid that should have

15  been.  So many of us as employees who spent a lot of time, spent a

16  lot of work on these fake projects were left high and dry.

17          And so just to make a final point, I just think he has a

18  high propensity to lie, cheat, and steal again in the future.  I

19  don't see him ever using any of the educational successes he has

20  had in the past to do anything good in the future.  That's about

21  it.

22          I did have one question, Your Honor.

23          THE COURT:  Yes, sir.

24          VICTIM HAMMOND:  If we could have it brought up in the

25  court relating this matter to the recent case against

1    Mr. Christopher Cook who did a similar scam operation with elderly

2    folks at Leisure World down in Laguna.  He was sentenced for seven

3    and a half years just recently, I believe in the last couple

4    months.

5             I really want to know what is different between this

6    situation and that one, because I wholeheartedly believe that Mr.

7    Landreth should be kept out of society and out of doing business

8    for quite some time.

9             THE COURT:  Your question certainly is a fair one.  I

10   wish I could answer it.  I just want to be candid with you, I

11   can't because I'm not familiar with Mr. Cook or that case.  Was

12   that a federal case or state case?

13            VICTIM HAMMOND:  I believe it was -- I'm not sure, Your

14   Honor.  I just know that it was in the papers and it was recent.

15   So I'm not sure how much newsworthiness it received.

16            But that's everything that I would like to say.

17            THE COURT:  I appreciate your comments.  I notice from

18   the presentence investigation report your name is down there, sir,

19   for $20,000.  I assume that's wages?

20            VICTIM HAMMOND:  Correct.  Actually that was, in a

21   sense, a form of profit-sharing, if you will.  It was promised

22   bonus that was reinvested into one of the projects.  Missed wages

23   are probably in the 20- to $30,000 range.  And then with my

24   extended family, my mother invested another $20,000.  She is not

25   here so she wanted me to represent her as well.  And my brother

21

1    and sister-in-law as I spoke of earlier they had invested another

2    20,000.  That's Laura and Victor Adint.

3              THE COURT:  Okay.  Thank you, sir.

4              VICTIM HAMMOND:  Thank you.

5              MR. STAPLES:  Yes, sir.

6              VICTIM DAVIS:  Good morning, Your Honor.  My name is

7    David Davis, and I'm the stepfather of Ryan Hammond.  And I

8    invested $90,000 and several partnerships, and assume the money is

9    lost.  I work hard.  I'm a physician.  And at the end of year I

10   have a pension fund that I contribute to, and basically this

11   represented three years of my pension fund contributions.  So that

12   will probably extend my retirement about three years beyond that.

13             I have an employer, Barbara who works for me whose

14   earnings were also part of the pension fund.  She's been hurt by

15   it.  And, of course, it affects my family.

16             The other thing I want to say above and beyond the

17   monetary loss is, to me having one's children being used as a

18   vehicle to steal from them is just above and beyond the usual

19   scheme.  Somebody takes my money because I don't do due diligence

20   or whatever, this seems to be certainly a notch or two worse to

21   have my own family rip me off and have to deal with my son's

22   distress about that as well as my own distress about the loss of

23   the money.  And I think that's something I want you to take into

24   consideration when you are sentencing, to be utilizing family

25   members to rip off their relatives or friends, or relatives anyway

1    and close friends as well, which I think can hurt just as much.

2            THE COURT:  I appreciate your comments.  Thank you, sir.

3            VICTIM SIMON:  Good morning, Your Honor.

4            THE COURT:  Good morning, sir.

5            VICTIM SIMON:  My name is Greg Simon.  I'm a former

6    student and employee of Mr. Landreth, and I have been asked by

7    several victims who weren't able to attend today to speak on their

8    behalf.  They are Arnold Cho, a former student and employee.

9    Grace Bou, a former student of Mr. Landreth's.  Both of them --

10   the three of us are the three signatores on that letter which you

11   referred to earlier.

12           THE COURT:  Right.

13           VICTIM SIMON:  In addition, my father Gregory Michael

14   Simon, another financial victim/investor, Jennifer Solari, a

15   family friend, and her mother Sharon Solari, also financial

16   investors, were unable to attend today due to work or personal

17   situation wouldn't allow them to get down this morning, although

18   they very much wanted to be here.

19           What I wanted to stress to the Court is as a former

20   student and person who spent a lot of time as an employee of Mr.

21   Landreth, I got to know this gentleman very well.  In school he

22   was a mentor for me.  He was someone I looked up to.  Of all the

23   professors I had at USC in my master of real estate development

24   program, he was one of the two that I really trusted.

25           I asked him for career advice.  And when he approached

1   me and asked me to come work for him, which I left a very good job

2   up in San Francisco, I immediately accepted due to these

3   fiduciary -- not fiduciary, excuse me, but this relationship was

4   trust, which we had established this rapport, which I didn't even

5   question just given the nature of this relationship and how I got

6   to know Mr. Landreth.

7        I respect the assistant district attorney's

8   recommendation on 41 months, however, I have to firmly disagree.

9   Having been able to be around Mr. Landreth and firsthand be able

10  to observe the treachery, the predatory practices of going after

11  students, going after, for example, Mrs. Sharon Solari, a recent

12  widow who is on a fixed income for the rest of her life, who

13  invested $100,000 with Mr. Landreth, I have seen -- excuse me, I

14  have been around him.  He is also a very intelligent man.

15       Despite what misperception of reality he may have, he is

16  an intelligent person.  And if we are to base -- excuse me, if you

17  were to base his sentencing upon his ability to make whole the

18  victims in this case, I feel it would be underserving the value

19  that could be brought to these victims, because I wholeheartedly

20  do not believe that Mr. Landreth will earn an honest dollar the

21  rest of his life.  He is too smart.  He knows how to get beyond

22  and around the conventions that will be there in place to try and,

23  I guess, corral him, so to speak, financially upon his release.  I

24  personally have written off my loss.

25       In addition to the $100,000 which I invested, I also

1  received a judgment from Department of Labor for unpaid wages, I

2  want to say approximately $24,000, which I also have written off.

3  I personally was taken to the brink of financial hardship.  I also

4  had experienced a failed relationship due to the emotional stress

5  of this entire process.

6         And in closing, I firmly don't believe, aside from Mr.

7  Landreth's ability to evade his responsibility to pay back the

8  victims, I don't believe that he will, after a short sentence, be

9  a changed man.  And really, the point here today is if there is

10  any positive outlook to this, is that he will change.  He will

11  understand that he did a significant amount of damage to some very

12  nice people who put their faith and trust in him.  And God hopes I

13  hope he changes from this and realizes there is a better path to

14  lead in life.  However, I highly doubt that after such a short

15  period in jail that he will have had a chance to become that

16  better person for society.

17         And I can speak on all the victims that I'm

18  representing, we would prefer to see more time serving a sentence

19  than the possibility which we view as very dismal of being repaid

20  or restituted our funds.  Thank you very much.

21         THE COURT:  Thank you, sir.

22         MR. STAPLES:  Yes, ma'am.

23         VICTIM OLIVIA:  My name is Nicol Amerafield Olivia, and

24  I was defrauded of several hundreds of thousands of dollars from

25  Mr. Landreth.  This was my life savings.  I had borrowed from

1    credit cards in this last investment and my children's college

2    education funds.

3              I want to reiterate what everybody has said here today.

4    He is very smooth.  He has been out to lunch with my daughter to

5    pick colleges and talk about her education.  He's taken from me

6    more than the three years of whatever it's been since this has all

7    come down.  He has impacted my family beyond belief.  And I

8    implore you to put him away for as long as possible, because

9    whatever happens to him is not enough.  It's not enough to satisfy

10   me or my children.

11             And as others have said, the victims have extended way

12   beyond those of us here.  All the people he has impacted, all the

13   people he has lied to, made false promises and made up stories,

14   made up people, made up identities.  And I don't believe he can be

15   rehabilitated.  And I don't believe he can be put away long enough

16   to satisfy me or the people he has affected.

17             THE COURT:  How did you become involved in the

18   investment?

19             VICTIM OLIVIA:  A very dear friend of mine was a student

20   of his, introduced us.  And we met many times.  I met him in 2003,

21   and we met many times and we had lunch.  We talked about projects.

22   We talked about opportunities for me to work with him.  We talked

23   about -- the worse part of it is having lunch with him and my

24   daughter and talking about opportunities for her, and knowing and

25   guiding my family and wanting to help the underdog, and just

26

1    wanting to be the good guy because he just felt that was his

2    obligation here.  And he was all the while just unconscionable,

3    just continued to just lie and lie and lie.

4          And everything you would question, he would come up with

5    slick answer for.  And it was -- I just do not believe this man

6    can be rehabilitated.  I don't believe that he wants to be.  He

7    talks a great game.  And he has really, really impacted my life.

8    And I don't care about the stories about his health and what has

9    happened to him since this has come.  That's self-inflicted.  And

10   I'll take responsibility for perhaps not doing the due diligence I

11   should have but, you know, my health has been impacted also, and I

12   hold him accountable.

13         THE COURT:  The presentence investigation report, ma'am,

14   indicates that you lost monetarily -- I understand your statements

15   about the emotional suffering and impact, but monetarily you lost

16   $300,000?

17         VICTIM OLIVIA:  Net of 388,000 I think it is.

18         THE COURT:  All right.  Thank you.

19         VICTIM HAMMOND:  Hi.  Lisa Hammond.  I'm Ryan Hammond's

20   wife.  This is hard.  And it's hard to see that it wasn't just us

21   because it felt so personal.  This man came to our house and

22   literally in our home lied to our faces for years.

23         The way we met him was through his horse.  He had a

24   horse at Ryan's mom's stable.  And he won her over.  He's someone

25   that cares for animals.  He is a great guy.  And he starts asking

1    about, you know, how is your son, and then they formed a

2    friendship.  And Ryan was looking to change his career.  He left a

3    job and put our financial future -- we weren't married yet -- on

4    the table.  And to be lied just every day for three years, to your

5    face, you just lose trust in anyone.  You don't trust yourself to

6    make decisions.

7         I think that's the hard thing.  We learned a lot from

8    this guy.  We're way stronger people.  This person had this impact

9    on our lives of ruining years and years.  My sister, who Ryan

10   talked about, we outreached to my sister, my own flesh and blood,

11   a person -- they don't make a lot of money, and this was a chance

12   for them to get a future for their children.  $20,000 lost.

13        His mother, you know, reaching out to his mother,

14   $20,000 lost.  Us, $20,000 plus.  We had to pay for all the taxes

15   that Barry never paid for us for Ryan's employment.  We had a home

16   fund.  We can't buy a home.  We had to start from scratch.  We're

17   30 years old.  And we had to start from scratch because we had no

18   money because he took everything.

19        And for Ryan to find a new job, it took him a year to

20   find a new job because you search Webster Investors and Google, oh

21   God, you worked for a scam.  You must be -- it took him nine

22   months to find a job and he had to take a pay cut to get a job.

23        Interview after interview, why would you fall for this?

24   And that's a question that will haunt us, I think haunt all of us,

25   how could we have fallen for this.  Both of us are Berkeley grads.

28

1   We had people that went to great colleges.  Doctors.  Ryan's mom

2   has a master's.  We are really smart people, but we have hearts,

3   and our hearts were broken by this man.

4            And my family, I mean, for Ryan to have to show up at my

5   family was really hard.  For two years we felt the guilt of having

6   to look my sister and husband and their children in the eye and

7   say, God, I am so sorry.  At Christmas time it was still hard

8   because the wound is just so there.  It will stick with us

9   forever.  I mean forever.

10           I think what I'm trying to say is this man has lied to

11  us every day for years and years.  And just the malicious looking

12  at your face, in your home, just evil, evil, evil.  And evil

13  deserves to be in prison.  When he gets out of jail, he can work

14  at McDonald's.  He has a record.  He can work at McDonald's.  Who

15  would ever trust him again to give us -- we have written it off.

16  We have moved on.  This obviously brings up wounds.  We want to

17  close these wounds and just move on.

18           We are not going to get any money.  If we get a check

19  for a thousand dollars, we're going to go Vegas and put it on a

20  hand on Blackjack because that's all it worth.  It's worth

21  nothing.

22           I think he should be in jail as long -- it couldn't

23  be -- she mentioned it could not be long enough because he has

24  hurt us all so much.  Not just financially.  Financially, money is

25  money.  It sucks.  But just that not trusting your own heart and

1   your brain anymore, how do you repair that?  It's so hard.

2        So I just hope that he gets more and more months and

3   months so it really makes him think about it when he is in jail

4   just being lonely thinking, I did this to myself.  So, thank you.

5        THE COURT:  I appreciate your comments, ma'am.

6        MR. STAPLES:  Anyone else wants to address the Court?

7   Thank you.

8        I believe that's it, Your Honor.

9        THE COURT:  Mr. Staples, why don't I hear from you then

10  at least Mr. Scolnick and Mr. Landreth know what has been said by

11  everybody.

12       MR. STAPLES:  There is really not much I can say to

13  follow on that, Your Honor.  I will address the enhancement for

14  abuse of trust.

15       As Ms. Hammond just stated, they were all very smart

16  people.  I believe it's inescapable that a professor of real

17  estate development and finance at the University of Southern

18  California does not occupy a position of trust vis-a-vis his

19  students, and even those he meets in the community, when it comes

20  to investments in real estate.

21       Certainly, as between himself and his students, there is

22  a bond of trust there.  I believe Mr. Simon said that the

23  defendant was one of his two favorite professors at the school, a

24  guy he really trusted and went to for career advice.

25       I believe as I stated in my sentencing position, it's

30

1    difficult to imagine a more -- it's difficult to imagine a

2    situation imbued with more trust than that between a teacher and a

3    student outside of a family.  Add to that the prestige of the

4    school involved, and I believe you have a clear abuse of trust.

5    The guidelines states that the position of trust must be one that

6    was used to either facilitate the crime, make it easier to commit,

7    or to conceal it.  And I would argue that in this case his

8    position as professor at a prestigious school did both.

9          It's almost -- risks overstating the fact that if a

10   professor of real estate finance approaches you with an offer to

11   invest in a real estate project, you are not going to have a whole

12   lot of questions in your mind.  You are going to believe that that

13   person represents a prestigious institution and that's someone

14   within whom you can place your trust, both because of where he

15   works and the job that he holds.  He is a professor.  It's an

16   honored profession in our society.  They have very high ethical

17   standards by which they abide.

18         So I think clearly the abuse of trust applies both as to

19   his students and to others whom he met.  They didn't address it

20   specifically, but I'm sure if the Court wanted to hear, I believe

21   every one of these people will tell you, the victims will tell you

22   was the fact that he was a professor of real estate development

23   and finance at USC, did that factor in your decision to give him

24   money?  Did that give you a degree of comfort?  And I'm confident

25   each one of these victims would say yes.  That satisfies the

31

1    criteria for the abuse of trust enhancement.

2         Beyond that, there is not a great deal I can add.  By

3    the terms of the plea agreement, the government has agreed to

4    recommend the low end.  And beyond that, I can't say a whole lot.

5    The Court has heard much more eloquently from the victims than I

6    could ever state what they believe the sentence should be.  I'm

7    bound by the agreement to recommend low end so I will submit on

8    that.

9         We do have some issues to take up on the restitution.

10   We have an agreement as to the total loss amount.  It's $1,545,000

11   is our stipulated amount.  But we will likely request the Court

12   set a hearing some time in the future so that we can determine

13   whether any offsets apply and to get a more specific accounting

14   for each victim.  But we, I suppose, can address that at the

15   conclusion.  I supplied the court clerk with the statute

16   provisions that govern this.

17        THE COURT:  And I appreciate that.  And we'll go ahead

18   and set a restitutionary hearing, 30, 60 days, whatever makes

19   sense for the parties.

20        MR. STAPLES:  Beyond that, I would submit, Your Honor.

21        THE COURT:  All right.  Mr. Scolnick.

22        MR. SCOLNICK:  Thank you, Your Honor.  We're requesting

23   the Court impose a sentence of 24 months, a statutory sentence to

24   be served 12 months in custody followed by 12 months of home

25   confinement.

32

1          I would like to say a few words about Mr. Landreth and

2     about the offense and many of the facts of the case, but before I

3     do, I would like to thank the Court for taking the time and

4     consideration to read all of the exhibits.  And I guess I have to

5     address Mr. Staples in that respect as well.  I realize the amount

6     of material I put before the Court is uncommonly large, but I feel

7     that this amount of material, these exhibits were all necessary to

8     give the Court a better picture of what happened, of who Mr.

9     Landreth is, his background, some of the facts of the offense and

10    what he's already been through as a result of his own actions.

11         In addition to the exhibits that I submitted, Your

12    Honor, in addition to those showings of support, Mr. Landreth's

13    parents are here to show their support, and Mr. Landreth's friend

14    and doctor are also here.

15         Your Honor, this is without a doubt the most difficult

16    day of Mr. Landreth's life.  He comes before this Court having to

17    face his investors, having to face the Court, having to face his

18    parents, the people he respects most in the world, and

19    unfortunately having to face himself and look at what he has done.

20         Mr. Landreth committed a crime.  He made

21    misrepresentations.  People suffered as a result of the

22    misrepresentations he made.  But, Your Honor, Mr. Landreth has

23    accepted responsibility for his actions and he is trying to get

24    this matter behind him.  He is trying to make these victims whole,

25    and that's all he can do at this point.

33

1      I realize that the Court has a lot of considerations

2  today; it has a lot of factors that need to be considered, and not

3  the least of which are the victims.  We have heard the victims

4  speak today and Mr. Landreth's heart does go out to them.  He is

5  remorseful, Your Honor.  I submitted some papers and they were

6  filed under seal.  So the victims should know a few things and I

7  would like to share them with the Court, reiterate them as well as

8  the victims.

9      Mr. Landreth has already suffered as a result of his

10  actions.  Mr. Landreth, several years ago, was living a decent

11  life before he became involved in all this.  He has no criminal

12  record.  As a result of becoming involved with this offense -- and

13  it is as a result of own actions, of his own misconduct -- he

14  already has suffered a great deal.  His life is essentially

15  changed for the worst.  It's been ruined by this offense, by his

16  own conduct.

17      His wife and his mate of 19 years is probably going to

18  leave him.  His career obviously is over.  His reputation is

19  ruined.  And most of the friends he has have turned their backs on

20  him.  All he really has left is his family here today to show

21  their support, but even his family is certainly ashamed.

22      In addition, Mr. Landreth, due to the losses he suffered

23  on a personal and family level, he also has suffered in his

24  health.  I have known Mr. Landreth for about a year now and I have

25  watched Mr. Landreth's health literally deteriorate before my

1   eyes.  Mr. Landreth suffers from a long list of ailments common to

2   a man twice his age, and it's unfortunate.

3           I have spoken with Mr. Landreth, I have spoken with his

4   family, and I have spoken with -- received letters at least from

5   some health care professionals, and they believe and concur that

6   Mr. Landreth's stress and the guilt he felt for this offense was a

7   large -- a significant if not the only contributing factor to some

8   of these ailments.

9           Mr. Landreth is going to require surgery and he is going

10  to suffer.  I don't mean to -- when I say he is going to suffer, I

11  don't mean to belittle or downplay the suffering the victims have

12  already gone through or will go through in the future, but Mr.

13  Landreth has not made it through this offense unscathed, and it's

14  important that the victims know that.

15          In addition to the information I submitted to the Court,

16  Your Honor, I also received a letter from a doctor.  It is from

17  Mr. Landreth's doctor, and the Court has received letters from

18  this doctor before and the exhibits.  I submitted this exhibit to

19  the government last week because I was going to be addressing it

20  today.  This letter does confirm that Mr. Landreth is suffering

21  from a condition that will -- is chronic and progressive and will

22  require surgery.

23          How this will factor into the sentence I would leave up

24  to the Court, but it will require surgery in the next couple

25  months and the recovery time would be at least three months up to

35

1    six months.  If the Court would be willing to delay the

2    self-reporting date, I think that will probably take this into

3    account because it is a 3553(a) factor that we should address.

4           THE COURT:  It doesn't sound like it's voluntary

5    surgery.

6           MR. SCOLNICK:  It is not, Your Honor, I would be happy

7    to submit it to the Court.

8           THE COURT:  Would you please?

9           MR. SCOLNICK:  May I approach?

10          THE COURT:  Yes.

11          MR. SCOLNICK:  I apologize for highlighting it.  It was

12   to make talking points here.

13          Your Honor, this letter that the Court has just read as

14   well as the exhibits that deal with Mr. Landreth's medical

15   condition are factors the Court should take into consideration

16   when imposing a sentence.  And we're asking that that sentence be

17   a 24-month split sentence, that is split the first 12 months being

18   in custody the second 12 being on home confinement.

19          One other consideration, Your Honor, that I should bring

20   up is that in addition to Mr. Landreth's suffering or the pain

21   that he has caused himself, he has experienced a deprivation in

22   liberty, and that's a significant one.  He's spent at least -- I

23   don't have the exact number, Your Honor, but he's spent at least

24   two months in custody at the beginning when he was arrested, at

25   the beginning of this case.  When he was released, he was released

1   on home confinement.  He had a GPS monitoring device that he was

2   hooked up to.  He couldn't leave his house for purposes other than

3   required medical, work-related and necessary trips.

4           He has lost out on a lot over the last year, and that

5   again is something the Court should take into consideration, he

6   has had this deprivation in liberty in addition to what he now

7   faces.  And he has complied with all of the conditions of this

8   Court, all the conditions of Pretrial Services.  He's performed

9   very well on pretrial release.  That being said, Your Honor,

10  unless there is anything else regarding the 3553 factors, I submit

11  on those.

12          I would like to address the abuse of trust.  Obviously

13  that's an issue on the table here.  The government is moving for

14  abuse of trust.  Needless to say, Your Honor, I concur with

15  probation that this is not an appropriate enhancement.  There's

16  not been evidence presented to this Court that would allow the

17  Court to find the government has met its burden in proving that

18  this is an appropriate enhancement.

19          THE COURT:  I certainly saw in your papers your position

20  on that.  Probation, I thought, was silent.  Did they conclude

21  that there was no evidence?  I know they didn't apply the abuse of

22  trust enhancement, but --

23          MR. SCOLNICK:  My understanding is that probation stated

24  there wasn't enough evidence to apply the enhancement.

25          THE COURT:  Unfortunately we don't have Mr. Abrams here,

37

1    but I didn't see any explicit statement in the presentence

2    investigation report or the addendum to that effect, although I

3    will agree with you, Mr. Scolnick, that they did not apply the

4    enhancement.

5           MR. SCOLNICK:  Well, Your Honor, I think that's for good

6    reason, because there hasn't been any evidence presented to the

7    Court that there was an abuse of trust.

8           In my papers I cite to 9th Circuit case law, and the law

9    is, that we're all required to follow and abide by, that a person,

10   a defendant must be in a position of trust in relation to his

11   victims at the time of the investment.

12          Now, I invite the government to correct me if I'm wrong,

13   Your Honor, because there are a lot of papers in this case, but my

14   recollection, my understanding of the events is that no current

15   student of Mr. Landreth invested in his -- invested with him while

16   they were a student.  There was one student who invested before

17   they were a student of Mr. Landreth and multiple after, but never

18   while they were in Mr. Landreth's class.

19          Taking and keeping in mind the law that there needs to

20   be a position of trust at the time of investment, there was no

21   relationship at all.  The fact that Mr. Landreth had a job at USC

22   does not create a position of trust to other people in the

23   community.  I think this is the most important point, Your Honor,

24   because there was no position of trust at the time of the

25   investment, this enhancement cannot apply.

38

1          Moving on, Your Honor, the position of trust must make

2     the concealment of the offense or the carrying the offense out

3     easier.  Now, there is nothing about a student/teacher

4     relationship that would lead one to believe they could invest with

5     a teacher.  I think if I understand Mr. Staples's statements, he

6     agreed with that, that there is nothing traditionally about a

7     teacher that would lead anyone in their class to believe that they

8     could invest with them, that their investments would be secure, or

9     that this is an appropriate place to place their money.

10          Mr. Landreth had these people's ear in their classroom.

11     He did not have their wallets.  This is not a case where a victim

12     or an investor goes to an investment brokerage house, or goes to

13     their lawyer, or goes to an executive of some large firm that's

14     responsible for investments, A, because there was no relationship

15     between the investors and Mr. Landreth; and B, because Mr.

16     Landreth held no position that would allow one to believe he had

17     those responsibilities to the investors or to the students.

18          And finally, Your Honor, all fraud cases involve trust.

19     In every fraud case a victim places their trust in -- a victim or

20     investor places their trust in a defendant.  And the defendant

21     necessarily violates that trust.  That's part of the offense.  In

22     order to apply the position of trust enhancement there needs to be

23     more.  There needs to be some extra indicia of a position of trust

24     and the person using that position to facilitate an offense or to

25     hide that offense.

1          Again, there hasn't been any evidence presented to this

2    Court in that effect.  Now, if the Court is going to consider the

3    victim's statements, either today in court or the statements that

4    have been submitted in writing, I would ask the Court to conduct a

5    hearing so we can determine whether or not -- the exact facts of

6    this case and what the evidence is and what the evidence isn't.

7    Obviously we have heard a lot of evidence today.  Well, I wouldn't

8    call it -- not necessarily evidence.  We have heard a lot of

9    statements today.  Some of it is hearsay, some of it is relaying

10   friends of friends of friends' experiences and what they have been

11   through.

12         But if the Court is seriously going to consider this

13   enhancement -- and it sounds like the Court is -- I would think

14   the appropriate thing to do would be to have a hearing to address

15   this, an evidentiary hearing.

16         THE COURT:  With all due respect, I don't think that's

17   necessary.  I believe when you look at the facts of the plea

18   agreement, what Mr. Landreth pled guilty to, who the victims were,

19   the nature of his position, a respected university professor has a

20   position of trust.  That's the way I see it.  That, to me, is an

21   undisputed fact.  And if it has anything -- if the offense has

22   anything to do with that position of trust, then I think there is

23   an abuse of that trust.

24         And I believe this investment scam was related to the

25   subject matter of him being a professor.  A lot of the investors

1  were former students, by your own admission.  He used his position

2  as a professor to market the investment scheme.  So I don't see

3  why an evidentiary hearing is necessary.  The victim statements,

4  they gave a little bit more detail and gave a face behind the

5  facts that I feel are undisputed before me.

6        MR. SCOLNICK:  Very well, Your Honor.  Before we rest on

7  the record where there is purportedly undisputed evidence and

8  positions, I'd just like to state for my part, so that the record

9  is clear, that we're certainly not submitting or stipulating or

10  coming to any sort of agreement that a professor is a position of

11  trust.  We're not doing that here today and we never have, we

12  never will.

13        THE COURT:  And I will concede you have very

14  respectfully, very professionally, and very zealously made that

15  clear, and I understand that.  And I know you have a job to do and

16  I commend you for doing it, and I take no offense, but I do

17  believe, Mr. Scolnick, I want to be candid with you, is there was

18  an abuse of trust for the reasons that I said.  And, in my

19  opinion, the facts that I need to support that enhancement for the

20  advisory guideline calculation are undisputed.

21        Again, there are many details that some of the victims

22  mentioned that I am not going to be considering.  For example,

23  Mr. Rosenberg talked about the Myrtle Beach articles.  That is not

24  before me.  That is hearsay.  I would agree with you.  I'm not

25  considering that.  But the fact that Mr. Landreth was a USC

1  professor teaching real estate courses and that the victims really

2  arose out of that position, I am considering that.

3           MR. SCOLNICK:  Okay.  Finally, Your Honor, just to clear

4  a few statements up so there is no confusion.  To my knowledge,

5  again, no current students invested with Mr. Landreth.  That's

6  point A.

7           And point B, since filing my papers, I have heard from

8  at least one student that told me that they took a class with Mr.

9  Landreth and throughout the class Mr. Landreth never brought up an

10 investment, never brought up an -- well, never brought up the

11 investment opportunity or tried to solicit students and was

12 friends with other students and never heard them speak about this

13 either.  So if the Court would like, I could submit that letter,

14 get a declaration from that individual.  I don't know if that's

15 relevant to the Court's consideration.

16           THE COURT:  Well, I don't know which way that cuts.  I

17 will accept what you are telling me as true.  But what you are

18 basically saying is not every student was a victim or a former

19 student was a victim.  I mean, I can concede that fact, but that

20 doesn't mean that there weren't former students who were victims.

21           MR. SCOLNICK:  What I'm saying, Your Honor, is that

22 during class hours Mr. Landreth certainly did not, to my knowledge

23 and my understanding of the event, is Mr. Landreth did not get up

24 in class and try to solicit students.  He did not actively try to

25 involve students in his ongoing investment at that time.  Now,

42

1     after the class was over and the semester was over with, the

2     students -- Mr. Landreth talked with these students.  They were

3     professionals in the business community, as was Mr. Landreth.  At

4     that point they no longer held a student/teacher relationship.

5     They spoke as two professionals, and at that point talk of

6     potential investments ensued.

7          THE COURT:  That's what is so upsetting I think about

8     this case, is by all accounts Mr. Landreth is a very intelligent

9     man and obviously has an aspect of him that's very charming.  And

10    he is smart enough to realize it would be pretty stupid, in the

11    middle of a lecture, for students to be soliciting his investment.

12         So I understand what you are saying.  Again, I just want

13    to be candid with you.  I'm not trying to give you a hard time,

14    Mr. Scolnick.  I wouldn't expect him to, during the middle of his

15    lecture, talk about his investments and getting his students right

16    then and there to invest.  That's pretty stupid, in my opinion.

17         MR. SCOLNICK:  With that being said, unless the Court

18    has any other considerations or questions about any of these

19    matters, and if the Court is going to hold that it's not going to

20    grant my request for evidentiary hearing, I would submit.

21         THE COURT:  I'm not for the reasons I stated.  Hopefully

22    from your standpoint it's clear, the reasons.  Because I do agree

23    with you, there are some of the victim statements, with all due

24    respect, I don't believe legally I can consider.  I believe it's

25    hearsay and it's not before me.  But the facts that I'm

1  considering for purposes of the enhancement to understand the

2  nature of this offense is that Mr. Landreth was a USC professor;

3  that the investors were former students or somehow connected with

4  the university in his teaching position.

5          I assume you agree with Mr. Staples about a

6  restitutionary hearing; that we need a separate hearing and make

7  sure that we have the correct number and we consider any

8  appropriate offsets.

9          MR. SCOLNICK:  I agree, Your Honor.  And Mr. Staples and

10  I have been -- and Mr. Howard as well, we have been working pretty

11  hard to save the Court time and resources to facilitate the

12  investors being paid back.

13          THE COURT:  I appreciate that.  I know this has been a

14  difficult day for Mr. Landreth but he does have an opportunity to

15  say anything to me that he would like.  You want to confer with

16  him and see if there is anything he would like to say?

17          MR. SCOLNICK:  If I could have a moment, Your Honor.

18  Thank you.

19          THE COURT:  You may.

20          (Counsel confers with defendant.)

21          THE DEFENDANT:  Thank you, Your Honor.  To prepare for

22  this moment, and you swear you are not going to get upset or you

23  are going to speak like you think you can -- and I knew I had an

24  incredibly heavy heart and soul for my actions, but also I had

25  purest intent until I got in trouble.

44

1        I am incredibly deeply upset at myself.  I had a great

2   career going.  And my actions, I just -- I have no idea how I, a

3   person this smart could have transgressed at this level.  I am

4   incredibly, deeply remorseful.  I stated that from the very

5   beginning.  I mean, I have brought great embarrassment upon

6   myself, my parents, my wife.

7        And if I may, Your Honor, I'd like to turn because I

8   want to apologize to the victims.

9        THE COURT:  You may, sir.

10       THE DEFENDANT:  I know you guys hate me at this moment,

11  and I really hope at some point you will accept my apology for

12  what I brought upon you and the pain that I have caused you.  And

13  I want you to know that I am 100 percent committed to making each

14  of you whole, each and every one of you whole.

15       I have suffered a great deal in my mind, Your Honor,

16  because I am a man who takes accountability for my actions.  I'm

17  asking you to give me that opportunity.  I do feel that I will

18  recover from my health issues.  Each is recoverable.  And I do

19  know I am 100 percent committed to living in the law, doing

20  everything I can to make each victim whole and to become an

21  advocate for people not to transgress.  And I do ask that you take

22  that into consideration for me, Your Honor.  And I deeply

23  apologize to everyone.

24       And Mr. Staples, thank you for your generosity in going

25  through this.  You could have made this a lot difficult for me and

1       my family, but you were very professional and Mr. Howard as well.

2               Thank you, Your Honor.

3               THE COURT:  I appreciate your words, sir.

4               THE DEFENDANT:  Thank you.

5               THE COURT:  Mr. Staples, is there anything else you

6       would like to add to the record, sir?

7               MR. STAPLES:  Just so it's clear, Your Honor, on the

8       issue of the abuse of trust, I believe it's paragraph 31 of the

9       presentence report does discuss some of the evidence that was

10      there.  Just so the record reflects that the Court has undoubtedly

11      read and taken into account what is said there.

12              Essentially as I read it, the probation office lays out

13      the facts sufficient to show abuse of trust, but for reasons they

14      don't make clear, didn't recommend it.  But that's just something

15      in addition to what was in the factual basis of the plea

16      agreement.  And with that, I submit.

17              THE COURT:  Thank you for that clarification.  It's

18      paragraph 31.  They indicate there was a significant breach of

19      trust and may have been rooted in Mr. Landreth's status as their

20      real estate finance professor; however, without more information

21      the two-level enhancement is not recommended at this time.

22              So you were right in some respects, Mr. Scolnick, and I

23      guess maybe not completely accurate in others.

24              MR. SCOLNICK:  Well, Your Honor, obviously any

25      contentions that there's a basis for this enhancement, obviously

46

1   if I haven't objected already in court I object now to what is

2   written in paragraph 31.

3          THE COURT:  Okay.  All right.  Mr. Scolnick, is there

4   anything else you would like to add, sir?

5          MR. SCOLNICK:  Just so we're clear, Your Honor, I think

6   that I was accurate.  As I said, the probation officer states that

7   without more information, a two-level enhancement is not

8   recommended.

9          THE COURT:  Right.

10         MR. SCOLNICK:  I would submit, Your Honor.

11         THE COURT:  And again, I think the record hopefully has

12   been clear.  My basis again is the USC professorship and he used

13   that position, which is a public position, to facilitate the

14   investment scheme, and that the investors, certainly some of the

15   investors were former students or affiliated with the university.

16         Again, I think those are undisputed facts.  And that's

17   the basis for why I believe the enhancement applies for purposes

18   of calculation at the advisory guideline range, but more

19   importantly for understanding the nature of the offense.

20         MR. SCOLNICK:  Your Honor, I'm not trying to be

21   difficult here, but I have to take issue with the contention that

22   Mr. Landreth used that position.  I think other people might have

23   considered that position when they decided to invest, but Mr.

24   Landreth did not use that position in soliciting others.  I do

25   take issue with that.

47

1          THE COURT:  Okay.  Duly noted.

2          MR. SCOLNICK:  Thank you, Your Honor.

3          THE COURT:  All right.  It's a sad case.  I don't take

4    any delight or satisfaction, and I assume Mr. Landreth and the

5    victims don't take any great satisfaction out of this day.

6          But for the plea agreement, I think I would be imposing

7    a pretty heavy sentence against you, Mr. Landreth, but I want to

8    give that plea agreement meaning.  But with all due respect to Mr.

9    Staples, I don't believe a sentence of 41 months is just

10   punishment.  And I mean that with all due respect.  In light of

11   the duration of your fraud, I do believe you abused trust and,

12   sir, you created extreme mental suffering.

13         I think the suffering that the victims talked about

14   today was genuine and they lost a lot more than their money.  So

15   in light of that, I do believe a variance from the advisory

16   guideline range is appropriate in this case.  I don't want to get

17   excessive and punitive but I do believe a variance from the

18   guidelines is appropriate.  And I'm going to impose a sentence of

19   six years, that would be 72 months.

20         Mr. Scolnick, hopefully you know me well enough, no

21   offense will be taken.  I know you are going to probably want to

22   take that up and you are encouraged to do so.  This isn't rocket

23   science.  It's an art.  It's a judgment.  That's why I was

24   nominated.  That's why I was confirmed by the Senate.  And it's

25   just what I think is right and wrong, and what is just and fair in

1   this situation.

2          I hope that the time in custody can be well spent by Mr.

3   Landreth.  He will be out and he'll have a significant portion of

4   his life remaining, is my hope and expectation.  I am not

5   intimately familiar but I am generally familiar with the medical

6   facilities that we have.  And given the general nature of his

7   physical condition, I do believe they can be adequately addressed.

8   If it was chemo therapy or some sort of immediate life-threatening

9   illness, I would consider deferring the sentence for a long period

10  of time, but my inclination is I'm not going to put Mr. Landreth

11  in custody today, but I would want him to self-surrender within

12  the next few weeks.

13         MR. SCOLNICK:  Your Honor, several things.  First, I

14  would -- obviously I would object to the Court's sentence on

15  multiple bases, not the least of which being notice for a variance

16  or departure above the guideline range.  This is the first I've

17  heard of the Court's intent to do that.  So I would object on that

18  basis.

19         In addition, the Court's self-surrender date.  I do

20  thank the Court for allowing Mr. Landreth to self-surrender at a

21  future date; however, it usually is more convenient and more

22  beneficial for all parties involved if an individual can

23  self-surrender to a location to which they're designated.  This

24  saves the marshals money and resources.  It's also beneficial to

25  the B.O.P.  And it's my understanding that it will have some

1    affect on Mr. Landreth's designation.  According to the Court's

2    ruling today, Mr. Landreth will be in B.O.P.'s custody for a

3    little while.  More than a few years.

4         I would ask the Court to extend the few week period to

5    allow Mr. Landreth time to self-surrender at a facility.  Normally

6    that takes four to six weeks, Your Honor.  It's my understanding

7    now that it's taking quite a bit longer, anywhere from 10 to 12.

8    I have a 10-week self-surrender case in front of Judge Selna who

9    is also in the courthouse, and that was not sufficient time.  The

10   individual had to check in to the Santa Ana city jail for two

11   weeks.  So I would ask the Court for three months.

12        THE COURT:  Well, you raised two issues.  Again, I don't

13   take any offense, Mr. Scolnick, but if you look at your plea

14   agreement, paragraph 11 says, "Defendant understands, however,

15   that the sentencing guidelines are only advisory and after

16   considering the sentencing guidelines, the Court may be free to

17   exercise its discretion to impose any reasonable sentence up to

18   the maximum set by statute for the crimes of conviction."

19        The statutory maximum for the crime of conviction is 20

20   years.  Also, I thought I made it clear during the change of plea

21   hearing that I wasn't bound by these recommendations.  So the

22   record is what it is.

23        As far as notice, whatever rights you have, they're

24   fully preserved, but I do believe that Mr. Landreth was duly

25   notified about what the potential penalties and punishments are.

1     Mr. Staples, I don't know on that point if you have

2     anything further from the government's standpoint.  If you agree

3     with Mr. Scolnick, I would want to know it now.

4     MR. STAPLES:  I do not, Your Honor.  I agree with the

5     Court.

6     THE COURT:  The second issue about the self-surrender

7     date, Mr. Staples, what is the government's position on that?  Do

8     you want to extend it to after the restitutionary hearing or do

9     you want to go with what my tentative was for a few weeks?

10     MR. STAPLES:  We would go with the Court's tentative.

11     The only thing I would add is I have not looked closely at the

12     medical letters provided.  I mean, I don't know what this

13     operation is he needs.  I think from the government's perspective

14     we would prefer to have it done before he goes into custody, but I

15     don't know.  Like I said, I have not looked at that closely.

16     THE COURT:  Mr. Scolnick, do you have any objection

17     showing your letter?

18     MR. STAPLES:  He gave me a copy.  What I'm saying is I

19     haven't read it closely to figure out what the actual timing might

20     be for it.

21     THE COURT:  It doesn't seem like it's insignificant

22     surgery but it's not a life-threatening surgery, and it seems to

23     me it's a medical condition that's going to require therapy.  And

24     it's orthopedic and nerve for his knee.

25     Again, I'm not trying to understate it but I have had,

1   unfortunately, people who are dying of cancer that we have had to

2   sentence.  That has more impact on me than his physical condition

3   and medical condition.  Again, not to understate it or say that it

4   isn't serious.  It is serious.  He needs to have care, but I know

5   we have facilities in Colorado and elsewhere that have excellent

6   medical care that might even provide him as good if not better

7   than what he would get around here right now.

8            MR. STAPLES:  With that, the government would join with

9   the Court's -- go along with the Court's inclination of

10  self-surrender in a couple weeks.

11           THE COURT:  Mr. Scolnick, anything else, sir?

12           MR. SCOLNICK:  I would be happy to provide Mr. Staples

13  with any additional information that he would like to see at this

14  point, but I would again request a self-surrender date in 12

15  weeks.

16           THE COURT:  I'll give a self-surrender date of three

17  weeks.  And if you are able to convince Mr. Staples otherwise, you

18  can submit a stipulation with a proposed order and I'll entertain

19  it.  I don't want to give you any false hope that I will

20  automatically sign off on it, but I will seriously entertain it if

21  you both can reach an agreement on it.

22           I will ask also if we could have in the judgment and

23  commitment order, Michelle, that B.O.P. do, in light of the

24  medical condition of Mr. Landreth, make sure that he is

25  immediately examined and that he is designated at this appropriate

52

1   facility that can get him the immediate medical care that he

2   needs.  So they need to be alerted of that.

3           All right.  We'll also set a restitutionary hearing.

4   How long do the parties need for that hearing?

5           MR. STAPLES:  Hopefully not very long, Your Honor.  The

6   idea by putting it off is to allow us time to put all the

7   paperwork together and make sure we have correct figures.  So we

8   will file something with the Court either jointly with Mr.

9   Scolnick or separately, but we will file something with the Court

10  and hopefully just be a matter of the Court ratifying what we

11  admit to the Court.

12          THE COURT:  All right.  So why don't I, just to be safe,

13  say approximately 30 days.  What is a good Monday morning?

14                  (Court has discussion with clerk.)

15          THE COURT:  August 20th at 8:30.  How does that sound,

16  Mr. Scolnick?

17          MR. SCOLNICK:  Yes, Your Honor.  That's fine.  Thank

18  you.

19          THE COURT:  Let's see where we are.  We'll tentatively

20  set it for August 30 at 8:30 a.m.

21          If we then could direct our attention to the sentencing

22  recommendation from probation in a letter dated June 4, 2007.  I'm

23  going through this letter now to see what revisions I will make to

24  it.  Looks like the third paragraph I'll need to indicate that the

25  amount of restitution will be determined at the restitution

1    hearing August 20.

2          I'm going to change the nominal monthly restitution

3    payments to $300, then the amount of custody will not be 41 months

4    but 72 months.

5          And I believe approximately three weeks from today's

6    date is when, Michelle?

7          THE CLERK:  July 30.

8          THE COURT:  I believe those are the changes that are

9    necessary.

10         Mr. Scolnick, is there any legal cause why I cannot now

11   impose that sentence, sir?

12         MR. SCOLNICK:  No, Your Honor.

13         THE COURT:  Mr. Staples?

14         MR. STAPLES:  No, Your Honor.

15         THE COURT:  Very well.  It is ordered that the

16   defendant, Barry Landreth, shall pay the United States a special

17   assessment of $100, which is due immediately.  It is further

18   ordered that he shall pay restitution pursuant to 18 USC section

19   3663(a).  He shall pay restitution based on an amount to be

20   determined at the deferred restitutionary hearing to take place on

21   August 20, 2007, at 8:30 a.m.

22         An amended judgment will be entered after such

23   determination of the amount.  Restitution shall be due during the

24   rate of not less than $25 per quarter, and pursuant to the Bureau

25   of Prisons Inmate Financial Responsibility program, if any amount

1   of the restitution remains unpaid after release from custody,

2   nominal monthly payments of at least $300 shall be made during the

3   period of supervised release.  These payments shall begin 30 days

4   after the commencement of supervision.  Nominal restitution

5   payments are ordered as the Court finds that Mr. Landreth's

6   economic circumstances do not allow for either immediate or future

7   payment of the amount ordered.

8           Pursuant to 18 USC section 3612(f)(3)(a), interest on

9   the restitution order is waived because Mr. Landreth does not have

10  the ability to pay interest.  Payments may be subject to penalties

11  for default and delinquency pursuant to 18 USC section 3612(g).

12          All fines are waived as it is found that Mr. Landreth

13  does not have the ability to pay a fine in addition to

14  restitution.  Mr. Landreth shall comply with General Order 01-05.

15          Pursuant to the Sentencing Reform Act of 1984, it is the

16  judgment of the Court that the defendant, Barry Landreth, is

17  hereby committed on count two of the three-count indictment to the

18  custody of Bureau of Prisons to be imprisoned for a term of 72

19  months.

20          Upon release from imprisonment, he shall be placed on

21  supervised release for a term of three years under the following

22  terms and conditions:  Number one, he shall comply with the rules

23  and regulations of the U.S. Probation Office and General Order

24  318.

25          Number two, he shall refrain from any unlawful use of a

1   controlled substance.  He shall submit to one drug test within 15

2   days of release from imprisonment and at least two periodic drug

3   tests thereafter as directed by the probation officer.

4        Number three, he shall participate in an outpatient

5   substance abuse treatment and counseling program that includes

6   urinalysis, saliva and/or sweat patch testing as directed by the

7   probation officer.  He shall abstain from using illicit drugs and

8   alcohol and abusing prescription medications during the period of

9   supervision.

10       Number four, during the course of supervision the

11  probation officer, with the agreement of Mr. Landreth and his

12  counsel, may place Mr. Landreth in a residential drug treatment

13  program approved by the United States Probation Office for

14  treatment of narcotic addiction or drug dependency which may

15  include counseling and testing to determine if he has reverted to

16  the use of drugs.  And he shall reside in a treatment program

17  until discharged by the program director and probation officer.

18       Number five, as directed by the probation officer Mr.

19  Landreth shall pay all or part of the cost of treating his drug

20  dependency to the aftercare contractor during the period of

21  community supervision pursuant to 18 USC 3672.  He shall provide

22  payment and proof of payment as directed by the probation officer.

23       Number six, during the period of community supervision,

24  he shall pay the special assessment and restitution in accordance

25  with this judgment's orders pertaining to such payment.

1       Number seven, when not employed at least part time

2   and/or enrolled in an education or vocational program, he shall

3   perform 20 hours of community service per week as directed by the

4   probation officer.

5       Number eight, he shall not engage as whole or partial

6   owner, employee or otherwise in any business involving loan

7   programs, investment programs or any other business involving the

8   solicitation of funds without the express approval of the

9   probation officer prior to engagement in such employment.

10  Further, he shall provide the probation officer with access to any

11  and all business records, client lists, and other records

12  pertaining to the operation of any business owned in whole or in

13  part by himself as directed by the probation officer.

14      Number nine, he shall not be employed in any capacity

15  wherein he has custody, control, or management of his clients' or

16  customers' assets or funds without the prior written approval of

17  the probation officer.

18      Number 10, as directed by the probation officer he shall

19  apply monies received from income tax refunds, lottery winnings,

20  inheritance, judgments, and any anticipated or unexpected

21  financial gains to the outstanding court-ordered financial

22  obligation.

23      Number 11, he shall cooperate in the collection of a DNA

24  sample from his person.  It is further ordered that Mr. Landreth

25  surrender himself by 12 noon, July 30, 2007, to the institution

1  designated by the Bureau of Prisons.

2          It is the Court's strong recommendation that the Bureau

3  of Prisons find an appropriate facility to deal with Mr.

4  Landreth's immediate medical condition.  In that regard, it is

5  requested that they provide him a medical examination as soon as

6  possible after his surrender.  In the absence of any designation

7  by the Bureau of Prisons Mr. Landreth shall report on or before

8  July 30 by noon to the United States Marshal located at the Roybal

9  Federal Building, 255 East Temple Street, Los Angeles, 90012.  Or

10  if it's more convenient to the courthouse -- marshal's office in

11  this courthouse, which is at 411 West Fourth street, suite 8000,

12  Santa Ana, California 92701.

13          Mr. Scolnick, is this courthouse or L.A. more convenient

14  for Mr. Landreth?

15          MR. SCOLNICK:  This one, Your Honor.

16          THE COURT:  All right.  Why don't we then delete the

17  surrender to the marshal's office from the judgment and commitment

18  order.

19          And just put the address, Michelle --

20          MR. STAPLES:  For the record, Your Honor, suite 8000 is

21  my office.  The marshals are on the second floor.

22          THE COURT:  On the second floor.  All right.

23          Mr. Landreth, sir, one issue I must address with you,

24  and that is giving you an admonition of your right to appeal, sir.

25  I recognize that this has been a difficult day for you, but after

1    thinking about it and discussing it with Mr. Scolnick, if you

2    decide to pursue any appellate rights you have, you certainly can

3    do so.

4          In your plea agreement you agreed to waive certain

5    appellate rights.  Whatever rights you have remaining as a result

6    of that waiver, or if you want to challenge the enforceability of

7    that waiver, or if you want to challenge the reasonableness and

8    the fairness of the sentence that I just imposed, you can file an

9    appeal with the 9th Circuit, the Court that sits above me.  But

10   you must do that within 10 days of entry of judgment.  So if you

11   can't find a lawyer to file such an appeal, sir, you can let the

12   clerk of the court know that and then you just sign the form and

13   you have perfected your appeal.  All right, sir?

14         Is there anything further we need to discuss?

15         MR. STAPLES:  Two things from the government, Your

16   Honor, just briefly.  So the record is clear, I believe Your Honor

17   has said this, but if you could indicate that it has considered

18   the advisory guidelines and, what I'm assuming, has found them

19   inadequate for purposes of 3553 based on what the Court is

20   saying -- given the seriousness of the offense, the need for

21   deterrence and the need to protect the public, just so that that's

22   part of the record.

23         THE COURT:  I always appreciate making sure that the

24   record is clear.  That was my intent.  I hope that by listening to

25   the victims' statements, by reading thoroughly and considering

59

1  thoroughly Mr. Scolnick's papers, which were excellent I must say

2  and very thorough, and listening to Mr. Landreth, there were many

3  of the factors that applied to this case.

4       I do believe he does have a medical condition.  I

5  believe he has a mental health issue as well.  I do believe he has

6  suffered quite a bit.  He looks like he is going to lose his wife,

7  and that weighs heavy on me.  I also greatly appreciate his

8  acceptance of responsibility.  The fact of the matter is a trial

9  would be very, very stressful on everybody.  Probably most of the

10  victims would find that incredibly stressful, and then at the end

11  of the day who knows what the result would be.  So by accepting

12  responsibility for what he did he needs to be given credit for

13  that.

14       You started at the beginning of your statements, Mr.

15  Staples, saying that I'm aware of -- me, the judge -- aware of

16  many types of these fraud cases.  You are right.  Unfortunately,

17  we have many types of these cases in this court.  You and I had

18  one involving Mr. Lewis where I gave him the statutory maximum.

19       I did not give Mr. Landreth the statutory maximum.  I

20  didn't think that was appropriate or fair in this case given the

21  number of victims, given the amount that was lost and then given

22  these other compelling factors that Mr. Scolnick pointed out to

23  me.  But at the end of the day when I considered the other

24  sentencing factors -- just punishment, deterrence, and to protect

25  the public -- and I think about how long the fraudulent conduct or

60

1   scheme was perpetrated, when I think about the great, what I

2   believe was abuse of trust in the position that he had, and then I

3   think of the extreme mental suffering that these people lost, that

4   you cannot quantify in dollars or cents, I just didn't feel the

5   advisory guideline sentence, from my perspective, was fair and

6   adequate punishment.

7          But from your perspective, I understand you have to

8   present a case and you have to get all these victims together.

9   And I don't have any criticisms of what you agreed to in the plea

10  agreement.  And for whatever it's worth, I think what you agreed

11  was very reasonable and very favorable from the government and the

12  public's standpoint.  But you have your job and I have my job, and

13  that's why I felt a variance was appropriate.

14         MR. STAPLES:   I appreciate that, Your Honor.  My job

15  now shifts to defending this on appeal, so I wanted to make sure

16  the record was clear.

17         And then just lastly, the government would move to

18  dismiss counts one and three.

19         THE COURT:  And that motion will be granted in

20  accordance with the plea agreement.  All right.

21         Mr. Scolnick, anything else, sir?

22         MR. SCOLNICK:  Just briefly, Your Honor.  We would ask

23  for a designation in Pensacola, Florida if possible so Mr.

24  Landreth could be near his family.

25         In addition, if the Court would think it's

61

1    appropriate -- I certainly do -- if we could make this an exhibit

2    of the Court, the letter we were all referencing.

3              THE COURT:  It is appropriate and I would like to make

4    it part of the record.  And I will give the recommendation about

5    the Florida facility with one caveat.  Given I have considered his

6    medical, physical condition, that, to me, takes precedence.  So I

7    would like him housed at a facility -- and I know in Colorado we

8    have some excellent medical facilities in the system, that he gets

9    the care and treatment he needs.  And once he gets that care and

10   treatment, if B.O.P. can house him in Florida, terrific.  And that

11   would be the recommendation of the Court, so he can facilitate his

12   transition back into society by having visitation by family

13   friends and loved ones.

14             MR. SCOLNICK:  Thank you, Your Honor.  With the Court's

15   permission, may I approach?

16             THE COURT:  You may.  Upon self-surrender the bond will

17   be exonerated but until that time, all conditions of bail will

18   remain.

19             MR. STAPLES:  Fine with the government.

20             MR. SCOLNICK:  Thank you, Your Honor.

21             MR. STAPLES:  Thank you, Your Honor.

22             THE COURT:  Thank you.

23                  (Whereupon the proceedings were adjourned.)

24

25

62

1

2                                    -oOo-

3

4                              CERTIFICATE

5

6          I hereby certify that pursuant to Section 753, Title 28,

7    United States Code, the foregoing is a true and correct transcript

8    of the stenographically reported proceedings held in the

9    above-entitled matter.

10

11   Date:   September 13, 2007

12

13

14   MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132

15

16

17

18

19

20

21

22

23

24

25